ADA SPANGLER, *by her Next Friend, Agnes Spangler,*
v. THE ST. JOSEPH & GRAND ISLAND RAILWAY
COMPANY.

No. 13,319.  (74 Pac. 607.)

SYLLABUS BY THE COURT.

RAILROADS—*Duty to Passengers.* It is the duty of a railroad company to exercise the strictest diligence to protect passengers on its trains from the misconduct and assaults of fellow passengers, not only while such fellow passengers remain on the train, but also after they have alighted therefrom at the station of their destination, whenever the company knows of the threatened injury, or reasonably might have anticipated that, under all the circumstances, it would occur.

Error from Marshall district court; SAM KIMBLE, judge. Opinion filed December 12, 1903. Reversed.

*John G. Parkinson,* and *W. W. Redmond,* for plaintiff in error.

*R. A. Brown, J. A. Broughten,* and *W. S. Glass,* for defendant in error.

The opinion of the court was delivered by

BURCH, J. : Among the many restless rushings to and fro of fretful man upon the earth was a Sunday excursion in July, 1901, from St. Joseph to Excelsior Springs, Mo., and return, conducted by the St. Joseph & Grand Island Railway Company. The little town of Gower, located some fourteen miles from St. Joseph, contributed eight or ten young men to the ferment of the teeming train. The schedule gave the day to the excursionists at the Springs. On the return homeward in the evening it soon became distressingly apparent that the Gower boys had abused their holiday into a drunken spree. Hilarity was presently succeeded by effrontery, which readily descended to vulgarity, and tended constantly to reach the pitch of maudlin fuss and quarrel. They surged back and forth along the aisles of the cars with swagger and oath and a hubbub of babble, and a fanfaronade of clubs they had cut for canes, corrupting the air with the fumes of liquor and of cigarettes, hectoring men and insulting women, entirely beyond the endurance of the rasped nerves and galled sensibilities of the decent people on the train. Some of the passengers were intimidated and made afraid. Many protests and appeals were made to the trainmen, whose efforts to preserve order were quite feeble. Passengers themselves remonstrated with the young men, and one of them, after witnessing an indignity

to a young woman, collared a rowdy and took him out of the car.

Because the St. Joseph passengers interfered with the prerogative of the Gower boys to be vulgar and vicious and vile, the latter became incensed, and turned their distempered thoughts to the subject of revenge. They cursed the St. Joseph people, and swore they would get even when they got off the train at Gower. Many persons in many parts of the train heard these threats and heard them repeated many times. They kept saying they would fix the St. Joe people when they got off at Gower—they would even up with the St. Joe people—they would have revenge on the St. Joe people when they got off the train. This threatening talk continued for a long time before the town of Gower was reached. The train officials frequently passed by while it was going on. One man who went through the train with the conductor heard it, and many men and women heard it in the presence of the conductor.

Upon its arrival at Gower the train had stopped but a moment until these threats were being carried out. No sooner had the Gower party alighted than some of them assailed the persons who remained upon the train with a fusilade of cinders and gravel and dirt thrown through the open windows, and which, scattering, beat noisily against the outside of the cars. Men and women suffered alike, and one gentleman was struck on the side of the head with a rock. Other of the ruffians walked forward and back, ramming their rude canes into the car and punching the passengers. As he did so one of them ejaculated, "How do you like that?" While this was going on one of the two conductors in charge of the excursion assisted the passengers to alight and then walked to

the forward end of the train, where the other conductor was found reading orders to the engineer. As the train started both conductors stepped on the steps at the front end of the first passenger-car, where they remained until a switch had been passed and closed, and then they went inside the car. This constituted the sum total of their watchfulness over the human beings in their care.

As passengers on the train that night were Ada Spangler, a maiden of 17 years, and her escort, Joseph Manon. Their homes were in St. Joseph. They occupied a seat together in the forward part of the second passenger-coach from the engine, and though certain ugly circumstances of the turmoil of that night had transpired near them, they had not become involved in it themselves. The air was pleasanter near the window, and she sat on that side of the seat. It was nearing ten o'clock when they approached Gower, and she had been leaning her head upon an improvised pillow he had made for her, but had not been asleep. At Gower they were both sitting upright, and while the train was standing still heard the storm of cinders and gravel striking against the side of the car. During the confusion, one of the Gower boys came to their open window and thrust his club cane through it, striking her in the breast, and causing her to cry out "Oh." Mr. Manon immediately closed the window, and just after the train had started a heavy iron burr from off a bolt, hurled by the hand of one who dropped his cane to do so, came crashing through the glass and struck her in the eye. She fell forward, and as he caught her, all limp and apparently unconscious, and endeavored to support her head with his arm, the fluid portions of her eye ran out upon his hand.

4—68 KAN.

Upon the trial of an action for damages brought against the railroad company for this injury, a demurrer to the evidence from which the foregoing facts are gleaned was sustained, and Miss Spangler brings the case here for review.

The law of the case is clear enough.

"It is the duty of a railroad company carrying passengers to provide for their quiet and comfort, and secure them against the annoying and offensive conduct of other passengers ; and where the conduct of a passenger is such as to render his presence dangerous to fellow passengers, or such as will occasion them serious annoyance and discomfort, it is not only the right, but the duty, of a railroad company to exclude such passenger from its train." (*A. T. & S. F. Rld. Co. v. Weber*, Adm'r, 33 Kan. 543, 6 Pac. 877, 25 Am. Rep. 543.)

This duty to make passengers secure is not limited to conduct exhibited in the interior of the train, but applies to assaults coming from the outside of the car as well. If the danger threatens from alongside the car, it should be averted precisely the same as if impending on any of its platforms or in any of its apartments. It would be a lame rule, indeed, which required nothing more than that a vicious person should be put off the train, and then left raging up and down its length, firing missiles through its windows. The Gower boys could have been separated from the orderly and sober part of the passengers while on the train, and when discharged from the car could have been sent away from it, and kept away from it until it was safe to proceed. For this purpose the conductor had the right, if necessary, to call upon all the trainmen and such passengers as were willing to assist. While not an insurer of the safety of its passengers,

the railroad company was bound to exercise the strictest diligence in protecting them.

"If the conductor did not do all he could to stop the fighting, there was negligence. Whilst a conductor is not provided with a force sufficient to resist such a raid as was made upon the train in this instance, he has, nevertheless, large powers at his disposal, and, if properly used, they are generally sufficient to preserve order within the cars, and to expel disturbers of the peace. His official character and position are a power. Then he may stop the train and call to his assistance the engineer, the fireman, all the brakemen, and such passengers as are willing to lend a helping hand, and it must be a very formidable mob indeed, more formidable than we have reason to believe had obtruded into these cars, that can resist such a force. Until at least he has put forth the forces at his disposal, no conductor has a right to abandon the scene of conflict. To keep his train in motion and busy himself with collecting fares in forward cars, whilst a general fight was raging in the rearmost car, where the lady passengers had been placed, was to fall far short of his duty." ( *Pittsburg, Fort Wayne & Chicago Railway Co. v. Hinds*, 53 Pa. St. 512, 517, 91 Am. Dec. 224.)

These rules, however, are subject to the qualification that the carrier shall know of the threatened injury, or shall have opportunity to know of it, or reasonably might have anticipated, under all the circumstances, that it would happen. (5 A. & E. Encycl. of L., 2d ed., 553; *Flint v. Norwick and N. York Transportation Co.*, 34 Conn. 554, Fed. Cas. No. 4873.)

In Fetter on Carriers of Passengers, volume 1, section 96, the subject is summed up in the following manner :

"Carriers of passengers are not insurers of the entire immunity of their passengers from the misconduct of fellow passengers or of strangers, any more

than they are insurers of the absolute safety of passengers in other respects. Nor can the carrier be held liable for such misconduct on the principle of *respondeat superior*, as in the case of the misconduct of his servants. But although the doctrine is of comparatively recent growth, it is now firmly established that a carrier of passengers must exercise the same high degree of care to protect them from the wrongful acts of their fellow passengers, or of strangers, that is required for the prevention of casualties in the management and operation of its trains, namely, the utmost care, vigilance, and precaution, consistent with the mode of conveyance and with its practical operation. While not required to furnish a police force sufficient to overcome all force, when unexpectedly and suddenly offered, it is the carrier's duty to provide help sufficient to protect the passenger against assaults from every quarter which might reasonably be expected to occur, under the circumstances of the case and the condition of the parties; and, having furnished such force, the carrier is chargeable with their neglect in failing to protect a passenger from assaults by strangers. This strict rule of duty must, however, be applied in view of the relation which the carrier sustains to all the passengers, and the circumstances of each particular case calling for its exercise. Knowledge of the existence of the danger, or of facts and circumstances from which the danger may be reasonably anticipated, is necessary to fix a liability upon the carrier for damages sustained in consequence of failure to guard against it."

Such being the law applicable to the facts, the question remains whether or not the facts disclosed were sufficient to entitle the plaintiff to the verdict of a jury upon them. A critical analysis of the testimony is not necessary. From the evidence relating to the character, condition and conduct of the young men, it is reasonable to conclude that some depredation was to be committed upon the St. Joseph passengers at Gower.

It is fairly inferable that the conductor knew, or should have known, of this danger, and hence that he should have exercised the highest vigilance and diligence to subvert it; that he failed to employ to that end any of the means at his command, and that the plaintiff's injury was the result of his negligence.

Therefore, the judgment of the district court is reversed, with the direction that a new trial be granted.

All the Justices concurring.