No. 31,332

Ruth L. Wilson (née Ingram), Edith M. Skinner, Arthur S. Ingram, and O. L. O'Brien, Administrator of the Estate of Walter E. Skinner, *Appellees,* v. The Security National Bank of Independence, *Appellant.*

(27 P. 2d 247.)

Opinion filed December 9, 1933.

*Chester Stevens* and *Frank Clampitt,* both of Independence, for the appellant.

*W. N. Banks, O. L. O'Brien* and *Walter L. McVey,* all of Independence, for the appellees.

The opinion of the court was delivered by

Smith, J.: This action was brought to cancel and annul a written instrument called "Assignment of contingent equity." Judgment was for plaintiffs. Defendant appeals.

The plaintiffs were the children of D. B. Ingram. D. B. Ingram was the nephew of John L. Draper, deceased. Under the terms of the will of John L. Draper his widow was given a life estate in all his property. Upon her death the income was to be shared equally by D. B. Ingram and Mary Ingram. Upon the death of either of

them leaving a child or children such child or children would receive in equal shares the income which the parent of such children would be entitled to, if living, and upon the death of the last survivor of the nephew and niece, that is, D. B. Ingram or Mary E. Ingram, the entire estate was to be divided between the children of D. B. Ingram and Mary Ingram, share and share alike. It will be seen that at the time of the signing of the instrument in question the plaintiffs had an equitable interest in the estate of John L. Draper.

The petition alleged facts about as detailed here with reference to the estate. It then alleged that at the time of the execution of the instrument D. B. Ingram was seventy-four years of age and in a weakened physical condition and easily influenced; that prior to that time his wife had been operated on at the hospital and had been an invalid for several years, and that on account of these things he was sorely in need of money to pay his bills. The petition then alleged that D. B. Ingram had dealt with George T. Guernsey and the Commercial National Bank, and had great faith and confidence in George T. Guernsey, and on account of this faith and confidence was easily influenced into doing the things set out.

The petition then alleged that the Commercial National Bank, acting through George T. Guernsey, in order to secure by fraud a claim against the equitable interest of plaintiffs in the estate of John L. Draper, induced D. B. Ingram to make certain false representations to plaintiffs in order to secure their signatures to the instrument in question. The petition then alleged that Ingram told plaintiffs that his indebtedness to the bank was $2,000 and that he had arranged to borrow $2,000 additional from the bank; that this would be all he would borrow from the bank; that he had no other indebtedness to the bank and that he carried life insurance in the amount of $4,000 which, in the event of his death, would pay all his obligations at the bank and that plaintiffs would be in no danger in executing the assignment. The petition then alleged that D. B. Ingram did have $4,000 life insurance, which was paid to his administrator and was used in paying debts of Ingram other than to the bank; that the bank had never agreed to advance Ingram $2,000 to pay the bills due to his wife's illness; that no such loan was ever made, and the bills were obligations against the estate of Ingram after his death; that at the time of the execution and delivery of the assignment Ingram was indebted to the bank for a much greater

sum than $2,000, but that plaintiffs were unable to give the exact amount of such indebtedness.

The petition then contained the following allegation:

"That said misrepresentations of fact, so made by D. B. Ingram to plaintiffs, at the instance and request of said Commercial National Bank, were fraudulently made, with full knowledge of their falsity by both D. B. Ingram and said Commercial National Bank and for the sole purpose and object on the part of said Commercial National Bank of obtaining by fraud from said plaintiffs said assignment and of securing a claim against the estate of John L. Draper, deceased, and of depriving plaintiffs of their interest in said estate.

"That said plaintiffs believed said statements to be true and relied upon them as being true, and without knowledge of their falsity, and without any consideration therefor, executed and delivered said assignment."

The petition then set out the specific acts of misrepresentation by Ingram, which contained the following allegation:

"That said D. B. Ingram made said statements at the instance and request of George T. Guernsey, Sr., president of the Commercial National Bank, made at Independence, Kan., orally that plaintiffs cannot give the full substance of such request, but that said George T. Guernsey, Sr., as president of said bank, asked and directed said D. B. Ingram to secure such assignment from plaintiffs, and that said D. B. Ingram, acting under such direction, did secure such assignments in the way and manner herein set out, and delivered them to said George T. Guernsey, Sr., president of said bank.

"That the said Commercial National Bank in inducing the said D. B. Ingram to procure said assignment from plaintiffs, was pursuing a scheme and plan by which it intended to and did induce plaintiffs, through a desire to assist their father in his difficulties, to execute to said bank said assignment and by fraud procured from plaintiffs the assignment of interest in the estate of John L. Draper, deceased."

The petition then alleged that after the death of D. B. Ingram the defendant filed a claim against his estate upon his notes in the aggregate sum of $20,200 and prayed the probate court to have the claim allowed as secured claims against the interest of John L. Draper, deceased.

The petition then alleged that plaintiffs did not learn of the misrepresentation of facts to them until May 1, 1930, and did not discover the fraud practiced upon them until the 1st of May, 1930, and that on or about the 30th day of August, 1930, the receiver of the Commercial National Bank assigned all of its assets to The Security National Bank of Independence, Kan.

Plaintiffs prayed for an order annulling the assignment. Defendant answered claiming that the petition did not state a cause of action. It further answered with a general denial.

The answer further alleged that if Ingram was in the condition alleged in the petition it was well known to plaintiffs and they were obligated to inquire with that degree of diligence, commensurate with the circumstances, into the debts and financial condition of D. B. Ingram, and that their failure to do so was negligence barring their recovery in the action. The answer also charged that plaintiffs were guilty of laches in waiting from May 1, 1930, until March 4, 1932, before filing suit.

The defendant further made the assignment an exhibit and attached it to the answer and alleged that plaintiffs became bound by its terms.

The answer then expressly denied that either the bank or Guernsey induced, authorized or persuaded Ingram to make any representations whatever to plaintiffs to procure them to execute the assignment and further denied that either the bank or Guernsey conspired or entered into any scheme or device to procure the execution of the assignment and alleged that plaintiffs signed it of their own free will. The answer then pleaded the two-year statute of limitations.

It will be seen from the pleadings that plaintiffs sought to cancel the assignment for the following reasons:

"1. That Dwight B. Ingram made certain false and fraudulent representations concerning his obligations, particularly to the bank, to his children, with the intent and purpose to defraud them.

"2. That such false and fraudulent representations were made at the instance and request of George T. Guernsey as president of the bank and in the consummation of a scheme and plan agreed upon by the bank and Dwight B. Ingram to defraud his children of their interest in the Draper estate."

The answer relied on by the defendant in the main is a denial of the second of the above reasons. It became incumbent on plaintiffs to prove this in order to establish their cause of action.

The case was tried to a jury, which returned a verdict for plaintiffs. Judgment was rendered on the verdict. At the close of plaintiffs' evidence defendant demurred to it. This demurrer was overruled. At the end of the case motions for judgment and for a new trial were overruled. The correctness of all these rulings is brought here on this appeal.

On account of the conclusion that we have reached as to the demurrer to the evidence we will pay particular attention to the evidence offered by plaintiffs.

As has been seen, the action was begun by the children of D. B. Ingram, Walter E. Skinner being the deceased husband of Edith M. Skinner. The evidence offered and relied on by plaintiffs is in the testimony of the children as to the statements of their father at the time they executed the assignment, together with the evidence of the surrounding circumstances.

Ruth Wilson testified that she was teaching school when her father came to the schoolroom to obtain her signature. Her father spoke of bills he owed, stated he did not need much, just enough to carry him until he could get on his feet. She testified that her father was seventy-one years old and that her mother had just returned from the hospital where she had an emergency operation and her father was in debt for the bills. At that time she was unmarried and living with her father and mother. Her father spent most of his time during the day down town on business.

Edith Skinner testified that at the time she signed the instrument she was at her parents' house; that her father said the bills were so heavy that he needed money; he said it would not mean anything to her because he only needed $2,000. He said he owed the bank $2,000. Her father was seventy-one years old at the time and she had noticed he was failing. The instrument shows it was signed before Daisy Frazier as notary, but she did not go before Daisy Frazier to sign it. At the time she signed her sister had already signed. She did not learn about how much her father really owed the bank until the bank filed its claim in the probate court. Her father had one $2,000 life insurance policy which was paid to an aunt in Massachusetts and one for $2,000 which was paid to the administrator of his estate.

Arthur Ingram was the son of D. B. Ingram. He testified that he signed the instrument at his place of business. He objected to signing because there was no consideration and no amount set out in the assignment. In answer to a question his father said he only owed $2,000 at the bank and that he needed $2,000 more to settle his bills. His father stated that he had two life insurance policies for $2,000 each and that if anything happened the children would have that money to take up the notes. After he signed the agreement his father put it in his pocket. His father then asked him to go over and tell Mr. Guernsey that he had signed it. The same day in the afternoon he went to see Mr. Guernsey and told him that he

had signed. After a few days he became worried and again called Mr. Guernsey. He told Mr. Guernsey that the children had signed so that their father could get a little money to pay his bills, that he did not read it carefully, but as he remembered it there was no amount set in there—he could sign away the entire amount. Mr. Guernsey said, "Of course we don't intend anything like that." There was nothing said about the amount of the debt he owed except that it would just be a small amount. He learned about the full amount his father owed when the bank filed its claim in the probate court. His father had been doing business at the Commercial National Bank for about ten years.

At the beginning of the evidence plaintiffs introduced the ledger sheets of the bank that show the account of D. B. Ingram. This constituted all the evidence upon which plaintiffs rely to establish their cause of action.

They rely on certain surrounding circumstances to sustain the burden of proof that the bank conspired with Ingram to make the false representations. The circumstances are that Ingram was heavily indebted to the bank which had carried him for a long time. Ingram was old and broken in spirit. Ingram induced his children to sign the instrument by misrepresentation. No consideration passed from either him or the bank; neither he nor the bank obligated themselves at all; the liability ledger of the bank shows that no additional moneys were advanced by the bank after the assignment—he received no benefit from it.

They argue that Ingram must have been influenced by the bank, because no reasonable man would have induced his children to do such a thing. They point out that the assignment is cleverly drawn, evidently by a skilled lawyer interested in the bank's welfare. It should be noted that there is no evidence of this. They point out that Guernsey himself deceived Arthur Ingram when he talked to him; that Guernsey knew of Arthur's statements that his father had deceived him. Almost immediately after the assignment Mr. Guernsey went to Northampton to investigate the value of the estate. They argue that the liability ledger of the bank shows that it was manipulated so as to make it show—if inquiry had been made at the time of this assignment—that Ingram did not owe the bank.

Plaintiffs rely on cases where this court has held that conspiracy to defraud could be proved by surrounding circumstances. We have no quarrel with that rule. We hold, however, that the evidence in-

troduced must prove the cause of action. It must be sufficient to more than arouse a suspicion that the allegations of the petition are true. On its face the transaction here, as far as the bank is concerned, is regular. What more natural than that a bank, seeing one of its customers in failing health and indebted to it, should require the customer to secure his indebtedness? It is done every day. The circumstances upon which plaintiffs rely to establish the fact that the bank knew about the misrepresentations of Mr. Ingram do not appear of sufficient weight to warrant a holding that the cause of action was established. We see nothing bad about having a lawyer draw up the instrument, nothing out of the way about Mr. Guernsey going out to look at the estate. The whole affair appears to us as the natural result when an aged man is asked to secure his indebtedness. He turned to the only place he knew of to obtain the security. The children were all adults and lived in the same city with their father and could very well have known about the condition of his affairs.

This court is reluctant to set aside a verdict of a jury and will examine the evidence upon which the verdict is based and indulge in every reasonable presumption from the circumstances to sustain the verdict. (See *Ratcliff v. Paul,* 114 Kan. 506, 220 Pac. 279, and cases cited.)

There is another rule to which we have always adhered. That is that fraud and deceit will not be presumed. Where a party has voluntarily signed an instrument and later seeks to avoid the effect of having signed on the ground that his signature was induced by fraud and misrepresentation, the fraud and misrepresentation must be made to clearly appear. See *Buchanan v. Gibbs,* 26 Kan. 277. There it was held:

"Where a party voluntarily signs and delivers an instrument affecting the property claims of others, and thereafter seeks to repudiate such instrument on the ground of ignorance of its contents or imposition by a third party, the fact of such ignorance or imposition should be made to clearly appear before such instrument is declared invalid." (Syl. ¶ 1.)

See, also, *Shriver v. Fourth Nat'l Bank,* 121 Kan. 388, 247 Pac. 443; also, *Elwood v. Tiemair,* 91 Kan. 842, 130 Pac. 362. After a careful examination of the record in this case we have reached the conclusion that the evidence of plaintiffs did not sustain the burden of proof laid upon them by the above authorities.

Plaintiffs argue that there was no consideration for the making of

the assignment on the part of the children. Plaintiffs did not plead want of consideration in their petition, and it is too late to raise it as a ground for recovery for the first time in this court. (*Insurance Co. v. Baer*, 94 Kan. 777, 147 Pac. 840.) There are two other reasons why this point would not have been good even had it been pleaded: First, the facts disclose that the father was extended leniency by the bank on account of securing the assignment from the children and that his notes were renewed subsequently. This was sufficient consideration to support the signing of the assignment by the children; second, the assignment was made by the children to the bank to secure the indebtedness of the father. It is not necessary that a consideration move to the surety in such a case. It is sufficient if it pass from the payee, that is, the bank here, to the principal, that is, the father. (See *Security State Bank v. Mossman*, 131 Kan. 508, 292 Pac. 935.)

From what has been said it follows that the trial court should have sustained the demurrer of defendant to the evidence of plaintiffs.

The case is reversed with directions to enter judgment for defendant.

HUTCHISON, J., not sitting.