No. 39,431

Mazie Jones, *Appellant*, v. Yellow Cab and Baggage Company, Inc., a corporation, *Appellee*.

(271 P. 2d 249)

Opinion filed June 12, 1954.

*William W. Dimmitt, Jr.*, of Topeka, argued the cause, and *Orval F. Baldwin, Edward Rooney, Jacob A. Dickinson, David Prager*, and *Sam A. Crow*, all of Topeka, were with him on the briefs for the appellant.

*O. B. Eidson*, of Topeka, argued the cause, and *T. M. Lillard, Philip H. Lewis, James W. Porter*, and *Charles S. Fisher, Jr.*, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Harvey, C. J.: This was an action for damages for personal injuries sustained by plaintiff alleged to have resulted from the negligence of defendant. The trial court sustained defendant's demurrer to plaintiff's evidence and she has appealed.

We think it unnecessary to summarize the pleadings further than to say that the relationship of the parties is not controverted and that the evidence hereinafter summarized was within the purview of the pleadings. The evidence may be summarized as follows:

Plaintiff testified that she was 36 years of age; that she lived at 629 Golden street, Topeka, with her two daughters; that she had previously been married to one Paul Dunn and divorced from him in 1949; that subsequent to their divorce Paul Dunn had threatened her on more than one occasion; had told her if she didn't remarry him he was going to kill her; had threatened her over the telephone on the night of May 12, 1952; that she was afraid and had previously filed a complaint against him with the county attorney because of such threats, and he had broken into her home. She further testi-

fied that she was employed as a cook in the officers club at the Topeka air base; that it was customary for her employer, the club manager, to pick her up each morning and to pick up her co-workers and take them all to work in his automobile. That on the evening of May 12, 1952, her employer called her on the telephone telling her that he would be unable to pick her and her co-workers up the next morning, May 13, and that he had hired a cab to pick her and her co-workers up and bring them to work; that the cab would come first to her home about 5:15 a. m. and she was to direct the driver of the cab to the address of the other workers and get out of the cab and knock on the door of each of them and let them know it was time to go to work. That on the morning of May 13, 1952, between 5:15 and 5:20 a. m. a Yellow cab belonging to defendant's company and driven by its agent and servant Floyd Branhan drove up to her home on Golden street; that she went out and got into the back seat of the cab; that just as she was approaching the cab she saw Paul Dunn running towards her; that plaintiff got into the cab and told the driver not to pick the man up; that she was afraid of him and that he had threatened her. The cab driver did not answer her but did turn and look at her. When Paul Dunn reached the cab he opened the front door and started to get in; plaintiff told him that he couldn't get in, that she was going to work and had passengers to pick up. Dunn said nothing; the cab driver said nothing. Paul Dunn got in the front seat and shut the door; the cab driver turned and looked at the plaintiff and she told him again that Dunn could not use the cab. The cab driver said nothing and Paul Dunn said— apparently addressing the cab driver—, "Well, fellow, take me to the bus stop and I will get out." Plaintiff had previously told the cab driver where the first stop was to pick up a passenger; the cab driver said nothing but started to drive to the first stop for plaintiff's passenger. As they approached the next bus stop, which was only a few blocks, plaintiff noticed the cab driver was not slowing down and she told him there was a bus stop and to let Paul Dunn out. The driver said nothing and did not slow down and let Dunn out but drove to the home of the first person plaintiff desired to pick up and stopped in front of the house. Plaintiff got out and went around the house and knocked on the back door. No one answered at first, finally the mother of the person who was to go to work told plaintiff that she couldn't raise him and supposed he wasn't going to work. Plaintiff went back to the cab. She didn't see Paul Dunn until she got almost to the cab when she saw him coming around the cab.

He said that he guessed he would be leaving, she told him she would appreciate it and proceeded to get back in the cab but got only partly in. She had opened the door and had one foot on the running board when Dunn started shooting at her; grabbed her by the dress with his left hand; pulled her free of the cab and she lost her footing. Dunn fired 6 shots at her; beat her over the head with his pistol, and slashed her across the throat with a knife. The cab driver drove away. Plaintiff testified to further abuses by Dunn and how she finally got to the hospital; her illness there; expense of it; the time she lost from work, and other items of damage, the amount of these need not now be considered.

There is not much question about the law of this case. In 13 C. J. S. p. 1294, the general rule is thus stated:

"A carrier is under the duty to use due care to protect its passengers from the torts or misconduct of fellow passengers and is liable for failure to comply with such duty."

In 10 Am. Jur., p. 100, the general rule is thus stated:

"The liability of a carrier is governed by the general rules governing liability for negligence. The duty of the carrier is to exercise the highest degree of care toward his passenger, and failure to exercise such care renders it liable for any resulting injuries."

Many sections of each of these works are devoted to various phases of the subject some of which are cited by counsel on each side.

In *Spangler v. Railway Co.*, 68 Kan. 46, 74 Pac. 607, cited by appellant, the syllabus reads:

"It is the duty of a railroad company to exercise the strictest diligence to protect passengers on its trains from the misconduct and assaults of fellow passengers, not only while such fellow passengers remain on the train, but also after they have alighted therefrom at the station of their destination, whenever the company knows of the threatened injury, or reasonably might have anticipated that, under all the circumstances, it would occur."

Appellee also cites the case and attempts to analyze it as not being applicable here. However, after the basic law is established the case must depend upon the facts.

In ruling upon a demurrer to evidence, particularly in a case which depends largely upon the facts, the court must give credence to all the testimony favorable to the plaintiff. It is not entitled to weigh the testimony. This rule is well established in this jurisdiction. We cite only a few of the many cases supporting it. *Cain v. Steely*, 173 Kan. 866, 252 P. 2d 909; *In re Estate of Modlin*, 172 Kan. 428, 241 P. 2d 692, p. 434 of the opinion, and authorities there cited.

In ruling upon the demurrer to the evidence in this case the trial court stated its reasons at length. We have examined this statement and think in doing so the court weighed and construed the evidence and failed to give to plaintiff the benefit of the evidence favorable to her. We think the case should be tried and let the jury under proper instructions find the facts. The result is the judgment of the trial court must be reversed. It is so ordered.