No. 40,345

CLYDE B. JONES and JUANITA JONES, *Appellants,* v. GILBERT L. COATE and MINA M. COATE, His Wife, *Appellees,* and GEORGE T. NORRIS and JOYCE NORRIS, His Wife, Defendants.

(306 P. 2d 148)

Opinion filed January 12, 1957.

*Emmet A. Blaes,* of Wichita, argued the cause, and *Stanley E. Wisdom,* of Wichita, was on the briefs for the appellants.

*Wayne Coulson,* of Wichita, argued the cause, and *Howard T. Fleeson, Homer V. Gooing, Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Robert J. Hill, Gerrit H. Wormhoudt,* and *Theodore C. Geisert,* all of Wichita, were with him on the briefs for the appellees.

The opinion of the court was delivered by

WERTZ, J.: This is an appeal from an order of the trial court sustaining a demurrer to plaintiffs' evidence in an action brought by them against defendants for the breach of an oral contract for the sale of an automobile agency. For purposes of clarity, appellants Clyde B. Jones and Juanita Jones will be referred to as plaintiffs or Jones, and appellee Gilbert L. Coate as defendant or Coate, and defendant George T. Norris as defendant or Norris. Appellee Mina M. Coate and defendant Joyce Norris are interested only as the wives of the respective husbands.

The petition alleged the sale of the assets of plaintiffs' automobile business, including real and personal property to defendants Coate and Norris as partners. The performance of the contract of sale by plaintiffs, and the subsequent breach by defendants was alleged.

Defendants Coate answered by alleging that no partnership existed between Coate and Norris, and that the oral agreement

and written instruments pertaining to the sale in question were obtained by the fraudulent conspiracy of plaintiff Jones and defendant Norris.

Plaintiffs' reply denied any false or fraudulent representations or agreements. On the issues joined, the case proceeded to trial by a jury.

At the conclusion of plaintiffs' evidence, defendants Coate interposed a demurrer that the evidence was insufficient to establish a cause of action in favor of plaintiffs and against defendants Coate for the reason, among others not here material, that the testimony of plaintiff showed that he was a participant in the fraud perpetrated by Norris upon Coate. The record disclosed that the trial court stated it was compelled to the conclusion that all the transactions in the case were not open and above board, and the demurrer should be sustained.

At the outset, we are called upon to review the sufficiency of plaintiffs' evidence as against defendants' demurrer, and not to weigh the evidence for the purpose of rendering a decision on the merits of the action. Before we analyze plaintiffs' testimony, it is well to emphasize certain established and repeated principles governing a ruling on a general demurrer to evidence. In testing the sufficiency of plaintiffs' evidence against the demurrer we will, under a liberal construction, consider all of plaintiffs' evidence as true, consider that favorable to plaintiffs together with all reasonable inferences to be drawn therefrom, *and disregard that unfavorable to plaintiff* and not weigh any part that is contradictory *nor weigh any differences between the direct and cross-examination* and, when so considered, if there is any evidence which sustains the plaintiffs' case, then the demurrer must be overruled. (*Shoup v. First Nat'l Bank,* 145 Kan. 971, 975, 67 P. 2d 569, and cases therein cited; *Robinson v. Short,* 148 Kan. 134, 79 P. 2d 903.) In *Staab v. Staab,* 160 Kan. 417, 163 P. 2d 418, we said that courts cannot weigh evidence but must disregard all unfavorable evidence and consider only evidence favorable to the party adducing it. In the case of *In re Estate of Dieter,* 172 Kan. 359, 239 P. 2d 954, we stated the trial court does not weigh the evidence but is bound to give all favorable evidence the most generous credence and disregard all evidence contrary thereto. (*Palmer v. The Land & Power Co.,* 172 Kan. 231, 239 P. 2d 960; *Siegrist v. Wheeler,* 175 Kan. 11, 259 P. 2d 223; *Jones v. Yellow Cab & Baggage Co.,* 176 Kan. 558, 271 P. 2d

249; *Worrell v. West,* 179 Kan. 467, 296 P. 2d 1092; *Jones v. Winn,* 179 Kan. 587, 589, 297 P. 2d 199.) In one of our most recent cases, *Brent v. McDonald,* 180 Kan. 142, 300 P. 2d 396, we said the court will consider only such portions of the evidence as are favorable to the party adducing it. The fact that the testimony may be meager or weak does not justify the taking of a case from a jury if that which is produced tends to prove the essential facts necessary to recover. (*Prewett v. Sholl,* 120 Kan. 158, 242 Pac. 149.) This rule has been repeated innumerable times, and to such an extent that it has become an elementary principle of law in this state.

Another well-established rule of law is stated in *Wyatt v. Taylor,* 166 Kan. 453, 457, 201 P. 2d 647, as follows:

"Citation of authority is hardly necessary to illustrate the long-established rule in this state that one who asserts fraud has the burden of proving it by a preponderance of the evidence; that such evidence should be clear, convincing and satisfactory; and it does not devolve upon the party charged with commiting the fraud to prove that the transaction was honest and bona fide. (*Long Bros. v. West & Co.,* 31 Kan. 298, 1 Pac. 545; *Bank v. Reid,* 86 Kan 245, 120 Pac. 339, *Fritts v. Reidel,* 101 Kan. 68, 165 Pac. 671; *Wilson v. Security National Bank,* 138 Kan. 610, 27 P. 2d 247.)"

Fraud is never presumed; must be proved, mere suspicion is insufficient. (*Frazier v. Railway Co.,* 97 Kan. 285, 287, 154 Pac. 1022; 3 Hatcher's Kansas Digest [Rev. Ed.], Fraud & Deceit, § 37.) The existence of fraud is a question for the jury, excepting only in the most flagrant cases. (West's Kansas Digest, Fraud, § 64[1].) Applying the above legal principles to plaintiffs' evidence, should the demurrer have been sustained? Their evidence, properly considered as against the demurrer is as follows: Plaintiff Jones's testimony on direct examination, so far as pertinent hereto, may be stated— For many years he owned and operated the authorized agency for the sales and service of Plymouth-DeSoto automobiles and GMC trucks in El Dorado. He owned the building and also leased a lot where he had 180 salvage automobiles. He had 24 new cars and trucks and about 34 used automobiles, and $20,000 worth of parts. The new cars, trucks and parts were mortgaged. On March 19, 1953, Jones was contacted by Norris and defendants Coate at Jones's place of business. Norris introduced the Coates to him and Mr. Coate said:

"We would like to look this place over, me and George (Norris) are planning on buying together as partners. . . ."

Jones called Mr. Barb, one of his salesmen, to show defendants around, and testified:

"I introduced him, told him these folks would like to look around, I wish he would show them around, show anything they wanted to be showed. I told them I had two book-keepers, they kept my books and anything in the way of financial statement, whether with the Chrysler people or not, anything he wanted to know go in and ask the book-keeper and she would be glad to tell them. I told them anything Mr. Coate wanted to know to tell them."

The next day, defendants again looked around, and left. They returned after dinner and Coate said: "Let's go over in the office and talk about this deal of ours." Jones, Coate and Norris went into the office and Coate said, "Will you take One Hundred Seventy (170) Thousand dollars for this business?" Jones said he would. Coate said, "Will you take George Norris' note for Thirty Five (35) Thousand dollars?" and "Would you take a section of land in Colorado for Thirty-five (35) Thousand dollars?" Jones said he was not a farmer, and if that was what it took to make the deal he wanted nothing to do with it. Coate said, "All right, we can't deal." After some conversation about how much wheat Coate had raised on the land in past years and that he then had a nice wheat crop on the land, Jones agreed to take the land at $35,000, Norris's note for $35,000, Coate's check for $20,000, and eight notes for $10,000 each, to be paid one a year, out of the business partnership of Coate and Norris. Jones agreed to the terms. Before the deal could be closed, Coate said he had to buy the four acres of ground where Jones had his salvage lot, and that Coate would go and see the lady who owned the lot. Coate made the deal for the salvage lot. Then he said, "Let's go up to an attorney and get these papers drawn up, and get it closed." The parties went to the office of Mr. Leasure, a reputable attorney, and all participated in telling him what they wanted to do and how they wanted the contract drawn. Later that day, they went back to the attorney's office and, after reading the contract and other papers, signed the prepared instruments. The contract, signed by Coate and Jones, provided that Jones agreed to sell a tract of ground which was the business premises and building of the downtown garage with all improvements thereon, and Jones's interest in his automobile business and agency, including all tools, equipment, automobile and truck parts and repairs, machinery located in the building, together with all automobiles, trucks and salvage owned by Jones, wherever located, for $100,000, payable $20,000 in cash, and $80,000 evidenced by

eight promissory notes. Coate issued his check for $20,000, payable to the order of Jones. The notes were secured by a mortgage on the El Dorado real estate which was executed by defendants Coate and, at the same time, defendants Coate executed their deed to the Colorado land to Jones, and all papers and documents were left in the hands of the attorney. The deed was then placed of record. Jones, at the instruction of Coate, turned the keys over to Mr. Norris. Coate had the locks changed on the doors and changed the name of the business to "Coate Sales and Service." Coate hired Mr. Van Meter as sales manager, and they went into possession of the salvage lot. Jones further testified that about ten days after Coate and Norris took over the business, Jones went to Mr. Leasure's office where he met Coate's attorney, who said they were breaching the contract and would pay damages, and would give him and his attorney two hours to go to the hotel and make a settlement.

Mr. Barb testified that on March 19, 1953, he met defendant Coate when he came over to buy the garage. He showed Coate around for about two or three hours at Jones's suggestion. During this time he heard the discussion between Coate and Norris concerning the fact they were going to buy the business as partners; that Norris would have the running of the south end (salvage lot, new trucks and used cars), and Coate would run the garage (new cars, used cars, parts, accessories and repairs).

Hazel Farquer testified she operated a grocery store in El Dorado, and that on March 20, 1953, Norris introduced Coate to her, stating that they were buying the Jones garage in partnership and wanted to buy her property in order to continue the salvage business. Mr. Coate said the entire deal would be off unless she sold them her property so that Norris could live there and park the salvage cars. She further testified Coate told her that he and Norris had been good friends for several years, and that he was an ambitious young fellow and he wanted to get into this business with him, and she was the only thing blocking the way. She finally agreed to sell the property, and Norris gave her a check.

Mr. Leasure testified that Coate and Norris came to his office, and Coate introduced himself and said he and Norris were dealing for the purchase of Jones's business. At a second conference, Jones and Coate discussed the terms and conditions of the contract. He made notes on which to prepare the contract. The Colorado land was a part of the consideration for the sale, and he was requested

to leave the land out of the contract by both Jones and Coate. Mr. Coate suggested it should be left out for tax reasons. Also, that Norris was to give Jones a note for $35,000. After the contracts were prepared, they returned and Coate executed his check for $20,000, and later the deed was executed for the Colorado land. The eight notes for $10,000 each, were signed by the Coates, payable to Jones, and the mortgage to Mr. Jones to secure the notes was also executed by Coate. Mr. Leasure further testified that about a week after the papers were executed, Coate's attorney came to his office and stated:

". . . that he represented Mr. Coate in this transaction and he said that Mr. Coate was not going through with his contract, that he was going to breach it and that he was going to tell Mr. Jones so, and that he had with him the keys to the building and that he was going down there and turn over the keys to Mr. Jones and tell Mr. Jones that Mr. Coate was going to breach his contract and that Mr. Coate wouldn't be back at the place of business any more, that he was going to his home. He also said that he knew and Mr. Coate knew that Mr. Coate would be liable for damages for breaching his contract and that he would recommend Mr. Coate pay to Mr. Jones any reasonable damage Coate had caused by reason of the breach of the contract and he said he hoped we could arrive at the damages."

Coate left the keys in the office of the automobile agency and returned to his home in the western part of the state. This action followed.

Defendants contend that plaintiffs' evidence on cross-examination disclosed Norris was acting as the agent of Jones in making the sale of the property, and that a dual agency was thereby created, and that there was such collusion between Norris and Jones as to constitute fraud and, therefore, precluded plaintiffs from recovering in this action. Defendants cite cases to the effect that where the plaintiff personally testifies to a set of facts which clearly preclude his recovery, he is bound by the testimony and cannot recover. We find no fault with this rule, but it has no application under the facts in the instant case. There was no evidence in the record that defendant Coate had not been fully informed of defendant Norris's capacity throughout the entire transaction. If defendant Coate, in fact, knew of Norris's position, there was no fraud. (*White v. Immenschuh,* 106 Kan. 333, 187 Pac. 667.)

We have carefully reviewed the evidence and find nothing from which it may be said that plaintiff Jones testified to any matter which precluded his recovery. The premise upon which the trial court based its ruling was clearly erroneous.

It follows that the judgment of the trial court is reversed with direction to grant a new trial.

It is so ordered.

HALL, J., not participating.