No. 43,910

WILLARD C. REEDER and JOYCE REEDER, *Appellees,* v. GUARANTEED FOODS, INC., *Appellant.*

(399 P. 2d 822)

Opinion filed March 6, 1965.

*Walter G. Klamm,* of Kansas City, argued the cause, and *Homer C. Bittiker,* also of Kansas City, was with him on the brief for the appellant.

*Harold J. Maddox,* of Kansas City, Missouri, argued the cause, and *Walter Fuller, Jr.,* of Kansas City, was with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in an action based on fraud wherein the plaintiffs recovered a jury verdict in the sum of $416.75 actual damages and $1,500 punitive damages. Judgment was entered on the verdict and an appeal was duly perfected.

The primary question to be determined is whether the evidence supports the verdict.

Willard C. Reeder and Joyce Reeder (plaintiffs-appellees) brought this action in the district court of Wyandotte County, Kansas, on the ground that they were fraudulently induced to purchase a deepfreeze unit and a food plan from Guaranteed Foods, Inc. (defendant-appellant).

The petition alleged that on or about the 10th day of October, 1960, the appellant, acting by and through its duly authorized agents, servants and employees, contacted the appellees and by false and fraudulent representations induced the appellees to purchase from the appellant an eighteen-foot deepfreeze unit for which the appellees gave a promissory note in the amount of $869 payable in equal monthly installments of $28.99 until paid. It alleged the appellant represented to the appellees that anyone who purchased the deepfreeze unit and food from the appellant was entitled to membership in the appellant's food plan; that members of the food plan were eligible to purchase their groceries from the appellant at prices lower than they could be purchased at chain stores such as Kroger, Safeway and A & P stores; that membership in the food plan and purchases from the food plan in the amounts and quantities which the appellees had been in the custom of purchasing to meet their needs, would result in monthly savings to the appellees in an amount which would equal the monthly payments on the deepfreeze unit; and the appellant represented that the retail value of the deepfreeze unit was $686.75.

The petition further alleged that the representations were believed to be true and relied upon to the detriment of the appellees; that said representations were false and fraudulent and known by the appellant to be false and fraudulent; that such statements were intentionally made by the appellant to induce the appellees to purchase the deepfreeze unit and for the purpose of inducing the appellees to execute the promissory note, whereupon the appellees alleged they were damaged and prayed actual damages in the sum of $416.75 and punitive damages in the sum of $2,500.

Upon joinder of issues the case was tried and the only witness who testified for the appellees was Willard C. Reeder, one of the appellees. Joyce Reeder, the wife, was called and testified as a witness for the appellant, among other witnesses called by the appellant in defense of the action.

The rule in this state is that one who asserts fraud, in an action such as this, has the burden of proving it by a preponderance of the evidence; that such evidence should be clear, convincing and

satisfactory; and it does not devolve upon the party charged with committing the fraud to prove that the transaction was honest and *bona fide*. (*Wyatt v. Taylor*, 166 Kan. 453, 457, 201 P. 2d 647; and *Jones v. Coate*, 180 Kan. 597, 306 P. 2d 148.)

Our review of the evidence will be made to determine whether there is clear, convincing and satisfactory evidence to support a finding that actionable fraud had been committed by the appellant.

The appellees' evidence established that they were man and wife and had a family consisting of themselves and two minor children. Mr. Reeder was a college graduate with a responsible semi-executive position at Hallmark Cards, Inc., at Kansas City, Missouri. He is an administrative assistant in the building director's office, with a degree in business administration.

On October 15, 17 and 19, 1960, the appellees were visited at their home by a salesman of the appellant, who explained a food freezer plan to the couple, and informed them that the appellant operated a wholesale grocery business in Kansas City, Kansas, selling in conjunction therewith deep freezers.

The plan as initially proposed by the salesman was that a deep-freeze unit could be purchased from the appellant, along with meats and foodstuffs at special prices, generally cheaper than could be purchased at supermarkets.

On the 19th day of October, 1960, after having examined a true copy of the promissory note and chattel mortgage to be signed by them, sample copies having been left with them on a previous trip by the salesman, the appellees signed the contract and entered into the plan.

Mr. Reeder testified that he insisted everything be put in writing.

The written order form signed by the parties, and dated October 20, 1960, discloses that Willard C. Reeder ordered an eighteen cubic foot freezer for a total cash sale price of $686.75. Immediately below this entry on the form it reads:

"The following services are extended to Guaranteed Foods, Inc. freezer customers at no cost and no additional charge has been or will be made.

"Food Spoilage Insurance * ............................... Included
"2 Year Free Service (Unlimited) ......................... Included
"5 Year Compressor Warranty * ........................... Included
"Unlimited Meal Planning and Processing Instruction .......... Included
"Guaranteed Foods Home Training ........................ Included
"Life Time Membership .................................. Included

"Membership Guarantees the Privilege of Continued Repurchasing of Food at Prevailing Quantity Prices."

Also included on this order form is the following:

"ALL FOOD

"UNCONDITIONALLY GUARANTEED

"This order includes: Food Supply No. _____ payable at the rate of $17.35 per week which includes all carrying charges.

"The Freezer Payments are at the rate of $6.83 per week, which includes all carrying charges as more fully set forth in the chattel mortgage agreement to be executed."

The following also appears on the order form:

"This order together with a chattel mortgage to be executed, constitutes the entire understanding and is not subject to written or verbal alteration except as provided therein and no other agreement, representation or understanding has been made, entered into or will be recognized.

"THIS MERCHANDISE WAS NOT BOUGHT ON TRIAL OR APPROVAL."

At the bottom of the form appear the following entries:

"Your Approximate Weekly Cost for The Food and Freezer is $24.18.

"You Previously Were Spending Approximately $25.00 Per Week for Our Type of Foods alone.

"Your Monthly Cost for The Freezer is $28.99 Starting Nov. 20 for 30 Mo.

"Your Approximate Monthly Cost for Food is $73.75 Starting Nov. 20 for 4 Mo."

The chattel mortgage on a form entitled "Kansas Retail Instalment Contract" was dated October 25, 1960, and indicates Willard C. Reeder was the buyer and Guaranteed Foods, Inc. the seller. The goods are described as a Zenith freezer, giving the model and serial numbers, and it sets forth a cash sale price of $686.75 with a total down payment of $16.75. To the difference of $670 was added insurance cost of $21.75, making a principal balance of $691.75. The finance charge was $177.95, making a total time balance of $869.70. The time sale price was $886.45.

The installment contract discloses the above time balance was payable in thirty successive monthly installments of $28.99 each, with the first installment due on November 20, 1960. The contract was signed by the parties and a promissory note attached at the bottom of the retail installment contract, also dated October 25, 1960, was executed by Willard C. Reeder and Joyce Reeder to cover payments in accordance with the terms of the contract.

On the reverse side of the promissory note is an endorsement of the note to Murphy Finance Company of Kansas City, Kansas, dated October 29, 1960.

While the ultimate question to be determined by this court is relatively simple, it is necessary to consider the evidence and go through a process of elimination to properly present the case.

Mr. Reeder testified:

"No, we didn't sign anything that evening. I told Mr. Mulloy that what he said—his proposition—could have some merit and we wanted to think about it, and we wanted to do some checking, and Mr. Mulloy bid us good night and we advised him that if we would be interested further, we would call him.

"And did the salesman come back?

"Yes, sir, he did.

"At that time, was there further discussion between you and this corporation salesman?

"Yes, sir, we again stated that we wanted to be sure that we understood the proposition that this was certainly a benefit; we understood that food would be delivered to our home, which would be a convenience. We understood that food would be sold to us at a discount of around 28 percent—it works out to that effect—and we wanted to make sure that we understood correctly regarding these matters, and we wanted to make sure we had these matters in writing because this was pertinent to us as far as this particular proposition was concerned. Otherwise, we are very well satisfied with the type of food that we were eating. We were very well satisfied with our diet, and we had no desire to change it."

Mr. Reeder testified the agent of the appellant stated the value of the freezer was $686.75 as indicated by the document, and based upon the representations of the appellant he signed a promissory note form which was attached to the Kansas Retail Instalment Contract, which he also signed.

He testified he was interested in the plan proposed by the agent of the appellant from the standpoint of omitting certain marketing and distribution costs by selling food direct from the appellant to the customer, and at the same time give the customer a good quality merchandise at a lower price. He said the agent did point out that in order to make this type of thing work they would have to have a place to store food, such as a basement where shelving could be built, and that they would need a freezer in order to receive and store the frozen products that where available today from the appellant's firm.

Mr. Reeder testified he and his wife kept records of the amounts spent for food over the past several years and they knew what kinds of food they bought. Based upon these figures he was able to tell the appellant's salesman what was spent from month to month and year to year, and at the particular time the deepfreeze was purchased they were spending on an average $140 to $150 per month for all of the food they used.

Mr. Reeder told the appellant salesman they had been spending

around $100 per month for the type of foods the appellant was selling; that is, meats, canned goods and staples. He testified the appellant's agent represented he could sell them similar merchandise for $73.75 per month. He said the appellant's agent told him about the additional benefits enumerated on the order form which he would receive by reason of buying the appellant's food.

The appellant's food plan called for the purchase of foods in quantity to cover a period of four months, and deliveries on $100 orders or more were made free of charge. There is testimony the appellant's salesman agreed he would personally make deliveries on smaller orders without charge to them.

After the purchase of the deepfreeze unit the appellees placed only three orders for merchandise with the appellant. The first order was on October 21, 1960, for $139.44. This produce was delivered on the 27th day of October. The second order was placed on November 15, 1960, for $17.40, and the third and final order placed on or about December 15, 1960, in the amount of $11.40.

Mr. Reeder testified he was satisfied with the quality of the food; that a home economist was sent to their home by the appellant; and that upon inquiry by the home economist as to whether the appellees had been coerced into going into the agreement or whether they had been high-pressured into the contract, Mr. Reeder answered in the negative. Sometime after December 15, 1960, when the third order for merchandise was made, Mr. Reeder went to various stores and looked at freezers, called freezer dealers, looked at literature and catalogs, and found a comparable freezer, in his opinion, could be purchased for $250. Thereupon, in March, 1961, Mr. Reeder informed the appellant they were dissatisfied with the plan, and in reply, Mr. Reeder said, an agent of the appellant informed him he had purchased the deepfreeze unit for $686.75 and he was stuck with it.

Mr. Reeder then testified between April 28 and May 28, 1962, he made a detailed study of their grocery buying and compared 1962 supermarket prices with the appellant's 1960 prices which show that instead of being able to save about 28 percent, they in fact were only saving 2½ percent on the purchase of their groceries.

On cross examination Mr. Reeder admitted the appellant's agent went into detail on the benefits of what the Guaranteed Foods plan was, and what he would receive under it; that such benefits were set out in writing in the contract. He further stated on cross examination the deepfreeze unit purchased was a good quality freezer,

just the recommended type, and was a good unit fully guaranteed; that he shopped around for other household items before purchasing from the appellant and compared prices with the prices of food purchased from the appellant. He testified he did not go out and check the prices of other freezers at the time he bought the freezer from the appellant; that he was not to pay for the freezer out of his funds; that he was supposed to pay for it out of savings that he would make on food.

Mr. Reeder further testified on cross examination he could not save 28 percent or make a $29 freezer payment from his savings. He admitted, however, that he made only three orders in six weeks *and did not follow the contract plan of a four-month order.*

Mr. Reeder on cross examination also admitted that a price list was furnished by the appellant's agent to him prior to the purchase of the deepfreeze unit which was complete except for the prices of meat. After using this price sheet to check against supermarket prices as compared to the appellant's prices, Mr. Reeder then called the appellant's salesman to return to his home for the third time when the contract was consummated. Mr. Reeder stated he knew that prices would vary and change from time to time.

It was in the latter part of January, 1961, that Mr. Reeder first contacted the appellant and stated he was dissatisfied with the plan.

Mr. Reeder further testified on cross examination that he could not buy food at the prices indicated on the price list he had first received and had shopped around with. On re-cross examination, however, Mr. Reeder admitted the price list furnished him *had nothing to do with his taking out or purchasing the plan.*

On cross examination Mr. Reeder stated that in the early part of January, 1961, a representative from the appellant came out to see them and interviewed the wife, at which time the wife signed an affidavit and made a report to the appellant's home economist who talked to Mrs. Reeder about how to use the freezer, use of leftovers and beneficial use in buying, in particular, sale items. He admitted there was a second report made to the appellant by his wife when he was not present. In this second "Home Economist Report" signed by Mrs. Reeder, dated January 4, 1961, and admitted into evidence, Mrs. Reeder answered questions on the form as follows:

"COMPLAINT   None.

"REMARKS—FOOD   Everything real good.   Meat real good.

"REMARKS FOR OFFICE   Using Freezer.   Real happy with Everything."

On the reverse side of the form which was entirely blank Mrs. Reeder volunteered the following statement:

"Since using the freezer, I have hardly missed a day baking or cooking. The freezer was especially helpful over Christmas for advanced preparation for company for meals and visitors.

Mrs. Willard C. Reeder"

On cross examination Mr. Reeder admitted it was in the summer, approximately July and August, 1961, that he went to Montgomery Ward and General Electric in the Fairfax District, and called several appliance dealers, and by looking in Sears' and Ward's catalogs he determined in his own mind the freezer's value to be fixed at $250. He also admitted he had the Montgomery Ward and the Sears Roebuck catalogs in his house at the time he entered into the contract in question.

Mrs. Reeder, called as a witness by the appellant, said the figures quoted by the appellant's agent were on a four-month purchase order basis, and that she understood the appellant would not make deliveries on orders under $100 without charge, but she expected the salesman to make the deliveries. She said by January 4, 1961, she and her husband had not made up their minds if the plan would operate for them.

Testimony of other witnesses called by the appellant did not add anything to the appellees' case.

The appellees' theory of the case is best summed up by the following excerpt from their counter abstract as follows:

"Mr. Reeder understood he was paying $686.75 which represented the value of the freezer and that the other benefits were free and were not included in the value of the freezer.

"Mr. Reeder did not go out and check the value of freezers during the period of time Mr. Mulloy came back on three occasions because he was more interested in what he could save on buying food from Guaranteed Foods; and, in any event, what he would save would pay for the freezer.

"It was not Mr. Reeder's understanding he had to buy four months groceries at a time from the defendant."

It has recently been held a verdict cannot be upset if there is any evidence in the record to support it, where such issue is clearly presented without complicating factors, but such rule yields to the impact of admissions made by a party in his testimony while a witness in the case, and such admissions are binding and conclusive upon him if uncontradicted or unexplained, whether such admissions are elicited on direct examination or on cross examination of the party. (*Hiniger v. Judy,* 194 Kan. 155, 398 P. 2d 305, Syl. ¶ 2.)

In this action the appellees seek to rely upon the representation that food would be sold to them by the appellant at a discount of around 28 percent, and based upon such savings the freezer payments could be made. Under this theory the actual overall cost of the freezer was immaterial to them, although they now assert on appeal another theory with regard to the freezer, hereafter to be considered.

It is apparent Mr. Reeder understood the savings on food purchased was not a 28 percent discount based upon the retail price of groceries which they had previously been paying at other food stores. This is indicated when he said, "We understood that food would be sold to us at a discount of around 28 percent—*it works out to that effect.*" (Emphasis added.) He further realized that storage facilities would have to be constructed in his basement to store the food purchased in large quantities, and that a deepfreeze would have to be installed to store frozen foods. The written order form executed by Mr. Reeder set forth in writing the monthly cost of food starting November 20, 1960, *for a four-month period.* It was in writing as he demanded. Thus, the evidence establishes that it was necessary to purchase food in large quantities from the appellant in order to effect substantial savings in the purchase. Instead of paying the supermarkets for the storage of food, the storage facilities would be in his own home, thus avoiding the storage and packaging costs.

Further admissions by the appellees indicate the conclusion upon which they seek to rely in this lawsuit is not substantiated by the evidence. In the first place, they had not given the food plan a fair chance to operate in that no quantity purchase pursuant to the plan for a period of four months had been made. Only one purchase amounting to more than $100 was made and this was the 20th day of October, 1960, the day after they agreed to purchase the deepfreeze unit. The evidence discloses this purchase was made up largely of meat. There is no evidence to indicate how long this supply lasted except the voluntary statement made by Mrs. Reeder in her second report to the appellant wherein she admitted the freezer was especially helpful during the Christmas holidays of 1960 for the advanced preparation of meals for visitors.

Both Mr. and Mrs. Reeder checked comparable food prices from the appellant's price list with other supermarkets prior to calling the appellant's salesman back to their home for a third time, and yet when they charge that the prices indicated on such price list were

misleading, they are confronted with another admission of Mr. Reeder to the effect that they did not rely upon the price list furnished in taking out or purchasing the plan.

Three weeks after the last small purchase of food was made from the appellant, Mrs. Reeder in her second courtesy report had no complaint and was "Real happy with Everything." Her only explanation for this statement was that "confusion reigned in the home" at the time she filled out the courtesy reports.

When the foregoing admissions are considered, together with other evidence in the record, it is apparent the appellees have not sustained the burden of proof by clear, convincing and satisfactory evidence as to false and fraudulent representations concerning savings on the purchase of foods from the appellant as the basis of an action for fraud.

On appeal the appellees contend they purchased a freezer which was represented to them as having a value of $686.75, and were told that the savings they would realize from buying groceries from the appellant would pay for the freezer. Later the appellees discovered that the freezer had no such value as represented and they were saving considerably less than represented.

Having failed to sustain the burden of proof with respect to fraudulent representations concerning the savings on the purchase of food, the appellees are left with the naked proposition that they purchased a deepfreeze which was falsely represented to them as having a value of $686.75, and that they later discovered the freezer had no such value.

It is the appellant's position that the appellees purchased a "package deal" or that they purchased a "freezer-food plan;" that the food membership plan was worth $300, and the appellees knew they were paying this. The appellant points to the order form which discloses freezer customers at no cost and no additional charge received numerous services specifically set forth in writing.

The actual damages sought by the appellees in their petition represent the difference between the actual value of the freezer (in Mr. Reeder's opinion $250) and the contract price of the freezer ($686.75). Actually, this figures $436.75, but the prayer in the petition requests only $416.75.

The jury returned a verdict for the full amount of $416.75 actual damages upon a special finding that the $686.75 to be paid by the appellees pursuant to the contract was for a deepfreeze only.

The simple answer to this question is found in the Kansas law.

Where one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expedience of the bargain. (*Jenkins v. McCormick*, 184 Kan. 842, 339 P. 2d 8.)

Conversely, an action for damages on the ground of fraud cannot ordinarily be based on representations of value, or of the price paid for the property by the seller, where there is no relation of confidence between the parties, and the property is subject to full inspection by the purchaser. (*Elerick v. Reid*, 54 Kan. 579, 38 Pac. 814, Syl. ¶ 1.)

In the opinion of the *Elerick* case the court said:

". . . Ordinarily, where the goods are open to the inspection of the buyer, he is presumed to be as competent to judge of their value as the seller. '*Venditor vendit quam maximo potest emptor emit quam minimo potest*,' is the maxim of the law stating the usual and permissible course of dealing, where there is no fraud or relation of trust or confidence. On the one hand, it is held to be permissible for the seller to puff and extol the commodity, and on the other, for the buyer to disparage and detract. However wrong in morals it may be for either party to express anything other than an honest opinion, the courts deem it the wiser and better rule to require each party to a trade to rely on his own judgment rather than to be permitted, after having made a bad bargain, to come into court on the claim that he relied on the judgment and opinion expressed by the adverse party." (pp. 581, 582.)

In the instant case a deepfreeze unit was the subject of purchase. This is an appliance readily available on the market from various stores selling household appliances.

Mr Reeder had no difficulty in determining what he considered to be the reasonable market value of the freezer by checking with various appliance stores, including the Montgomery Ward and Sears Roebuck catalogs which he had in his home prior to the purchase. Had Mr. Reeder been interested in the value of the deepfreeze prior to making the purchase. he could readily have ascertained its value just as he did after the purchase was made. There was no relationship of confidence between the agent of the appellant and the appellees concerning the transaction in question. It therefore follows that a representation of the value of the deep-

freeze unit in the instant case did not constitute actionable fraud, and evidence tending to support such charge is insufficient to sustain the burden of proof in an action based upon fraud.

Not having sustained the burden of proof to establish actual damages in this case, the appellees cannot recover punitive damages. Before exemplary or punitive damages may be awarded, the party upon whom the burden of proof is cast must establish actual damages and the right to recover therefor. (*Stoner v. Wilson,* 140 Kan. 383, 36 P. 2d 999; *Schumock v. Meerian,* 175 Kan. 8, 259 P. 2d 173; and *Watkins v. Layton,* 182 Kan. 702, 324 P. 2d 130.) Other rules concerning exemplary or punitive damages may be found in *Watkins v. Layton,* supra; *Jensen v. Sierra Petroleum Co.,* 189 Kan. 472, 370 P. 2d 425; and *Kohler v. Kansas Power & Light Co.,* 192 Kan. 226, 387 P. 2d 149.

Upon the foregoing reasons we hold the lower court erred in its failure to sustain a motion for a directed verdict, and in entering judgment upon the verdict.

The judgment of the lower court is reversed.