MID-AMERICA FOOD SERVICE, INC., Appellee,

v.

ARA SERVICES, INC., Appellant.

No. 77-1724.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1978.

Decided June 6, 1978.

R. S. McKenzie, Kansas City, Mo., for appellant.

Leonard B. Rose, Kansas City, Mo., for appellee; David W. Howard, Kansas City, Mo., on the brief.

Before HEANEY and HENLEY, Circuit Judges, and HANSON, Senior District Judge.*

HANSON, Senior District Judge.

This is a diversity action in which ARA Services, Inc., (ARA) appeals from a judgment against it for slander entered upon a jury verdict for $25,000 in punitive damages. No actual damages were awarded.

Mid-America Food Service, Inc. (Mid-America) is a Missouri corporation; ARA is a Delaware corporation. Both companies are engaged in the food service business and are competitors in the Kansas City area for private and public food service contracts. In May 1975 Mid-America and ARA were invited to bid on a Special Food Service Program co-sponsored in Kansas City, Kansas by two eleemosynary organizations, Turner House, Inc., and Cross-Lines Cooperative Council, Inc. The program was funded through the federal Department of Agriculture and was administered by the Kansas Board of Education. The purpose of the program was to provide approximately 1000 nutritional cold lunches daily to children of low income families. Three companies including Mid-America and ARA bid on the contracts.

The bids were opened May 9, 1975 in the presence of the bidders. ARA had the low bid. Mid-America bid approximately five cents more per meal. The third company had the highest bid and dropped out of the competition. ARA and Mid-America were advised that award of the contract would be announced at a May 16, 1975 meeting at Turner House. The meeting was subsequently held as scheduled. Present were Mary Ann Flunder and Leslie Yarborough of Turner House; Phillip Malott and David Shulman of Cross-Lines; Edward Lapin, vice president of Mid-America; and William Coleman and William Robertson of ARA. It was announced that Mid-America had been awarded the contract, whereupon its representative Lapin thanked the co-sponsors and departed.

After Lapin's departure, ARA representative Coleman queried the co-sponsors as to why ARA, the low bidder, had not received the contract. The conversation apparently became quite heated in the course of which Coleman was alleged to have stated words to the effect that Mid-America was having financial problems and might not be able to complete the program. He allegedly further stated that Mid-America had been "nearly closed down" by the health department. At trial Flunder and Shulman testified concerning Coleman's statements relative to Mid-America's financial condition; Yarborough and Malott testified with respect to the statements about the health department. Coleman and Robertson testified and denied that the alleged statements had been made. The imputation of financial difficulty and trouble with the health department constituted the defamation on which Mid-America predicated its cause of action for slander.

Mid-America was eventually awarded the contract, though representatives of the co-sponsors testified that Coleman's statements gave them pause about Mid-America's ability to perform and that Coleman's allegations were investigated.

The case was tried under the substantive law of Kansas. On the morning of the second and final day of trial the district court[1] held a conference on instructions with counsel for both parties. At the conference the district court made four rulings, an understanding of which is necessary to put this appeal in perspective.

First, the district court ruled that the defense of qualified privilege was not available to ARA as a matter of law. In this regard the court held that the defamatory statements could not have been made in good faith, and that there was no common interest between ARA and the co-sponsors of the program.

---

* The Honorable William C. Hanson, Senior District Judge, Southern District of Iowa, sitting by designation.

1. The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Second, the district court was particularly concerned about the impact of Supreme Court decisions in *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) on Kansas law in the private, non-media defamation context vis-a-vis the degree of fault constitutionally required for liability. With the acquiescence of Mid-America's counsel, the court announced that it would instruct the jury in substance that they could not assess either actual or punitive damages against ARA unless the jury first found that Coleman, in making the statements in question, "knew of their falsity or . . . acted in reckless disregard as to their truth." [2] *See Gertz, supra,* 418 U.S. at 347–49, 94 S.Ct. at 2997.

The third matter discussed at the instructions conference concerned punitive damages. On the evening preceding the conference, counsel for ARA advised the trial judge that counsel had read an unspecified Kansas case which indicated that a jury could find punitive damages without returning an award for actual damages. The district court prepared its proposed instructions in reliance on this information, advising the jury they could award punitive damages even in the event they did not award actual damages. Ironically, it was counsel for Mid-America who expressed reservation about the proposed instructions, saying that he was "scared" they were not a correct statement of the law. It is evident from the transcript of the instructions conference that the district court would have seriously considered changing the punitive damages instructions had clear objection been taken against them. However, counsel for ARA did not object to the proposed instructions while in conference and may fairly be said to have acceded to them as an accurate statement of Kansas law.

Finally, the district court dealt with what constituted the requisite "malice" for the purpose of punitive damage awards in Kansas. Over ARA's protests, the court opted for the standard articulated in *Schulze v. Coykendall,* 218 Kan. 653, 545 P.2d 392 (1976). *Schulze,* which dealt with the degree of fault necessary to overcome qualified privilege in a defamation action, defined malice as "knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not." *Id.* 545 P.2d at 399.

After the district court had instructed the jury, the parties were called on for exceptions to the instructions. ARA excepted to the court's earlier ruling on the unavailability of qualified privilege and the failure to propound an appropriate instruction. ARA also excepted to the court's definition of malice. Lastly, for our purposes, ARA attempted to except to the instruction it had earlier acceded to allowing punitive damages in the absence of an award of actual damages. ARA withdrew the objection, however, after a brief colloquy with the trial judge.

The jury returned a verdict for punitive damages in the amount of $25,000. No verdict for actual damages was returned. ARA submitted a timely motion for directed verdict, and a post-trial alternative motion for judgment notwithstanding verdict or for a new trial. The district court overruled said motions.

On appeal ARA argues that the judgment of the district court should be reversed for three reasons:

1. A verdict for punitive damages without an award of actual damages is contrary to Kansas law.

2. The district court incorrectly defined "malice" with respect to the requisite degree of fault for punitive damages.

2. By so instructing the jury, the district court must have believed that the evidence adduced established a case primarily for presumed and punitive damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349–50, 94 S.Ct. 2997, 41 L.Ed.2d

789 (1974). Indeed as the district court appeared to indicate in its post-trial order denying ARA's motion for judgment n. o. v. or a new trial, Mid-America's cause of action was, at bottom, one of slander per se.

3. The district court erred in ruling that Coleman's statements, if made, were not qualifiedly privileged, and in failing to give a related instruction.

## I.

The principal issue raised by ARA is whether the jury verdict for punitive damages, but no actual damages, can stand. Before analyzing Kansas law on the issue, a threshold question is presented concerning ARA's standing to assert such error on appeal.

### A.

The jury's verdict for punitive damages alone was in accord with the district court's instructions. In instructions 10 and 14 the district court advised the jury they could return punitive damages even though they might not award actual damages.[3] As noted, in shaping these instructions the district court relied on representations made by ARA's counsel. In the instructions conference shortly before the court charged the jury, counsel for ARA voiced no objection to the court's proposed punitive damages instructions. Only later, after the jury had received the instructions, did ARA's counsel attempt to enter a formal, unanticipated objection on the record. The objection was promptly withdrawn after the district court questioned counsel's good faith. Thus we are faced with a challenge to a jury verdict which was the product of instructions to which appellant ARA not only failed to make objection, but also encouraged and appeared to agree to as correct Kansas law.

The question arises as to precisely what it is ARA is appealing. ARA argues, somewhat disingenuously, and that it is not challenging the district court's damage instructions as such, but only the judgment on the jury's verdict for punitive damages as being contrary to Kansas law. ARA apparently views its post-trial alternative motion for judgment notwithstanding verdict or for a new trial as preserving this issue for our review. However, we find it impossible to so tunnel our vision as to focus only on the verdict while ignoring the instructions which so clearly precipitated it. Rule 51 of the Federal Rules of Civil Procedure is not so easily circumvented. If we were to adopt ARA's position, we would sanction a method whereby a party could belatedly raise objections by post-trial motion to alleged errors in instructions which should have been, but were not, objected to pursuant to Rule 51. Alleged errors of law rooted in the trial court's instructions generally must be raised in objections to the instructions and cannot be later resurrected by post-trial motion. *See Cohen v. Franchard Corp.,* 478 F.2d 115, 122 (2d Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973); *Marx & Co., Inc. v. Diner's Club, Inc.,* 400 F.Supp. 581, 585 (S.D.N.Y.1975), *modified on other grounds,* 550 F.2d 505 (2d Cir. 1977), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). Accordingly, we view ARA's attack on the jury verdict for punitive without actual damages as amounting to an appeal on the ground that the district court's punitive damages instructions were erroneous.

Rule 51 of the Federal Rules of Civil Procedure provides in relevant part: "No

---

**3.** Instruction 10 provided in part:

If you find for the plaintiff on the issue of liability, in addition to actual damages, or even in the event that you find plaintiff did not sustain any actual damage, the law permits the jury under certain circumstances to award a plaintiff punitive damages in order to punish a wrongdoer for some extraordinary conduct and to serve as an example or warning to him and others not to engage in such conduct.

Instruction 14 provided in part:

Form B is for punitive damages. In the event that you find for the plaintiff as to its

claim, whether or not you award any compensatory or actual damage, you may still consider the form of verdict marked Form B relating to punitive damages.

Though there were two pertinent instructions regarding punitive damages, the district court and counsel for both parties actually discussed only instruction number 14 in the instruction conference. Since the two instructions were virtually identical in permitting an award of punitive without actual damages, the fact that the district court did not discuss instruction number 10 with the parties is not significant.

**696**

party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Error in instructions not properly objected to is waived unless the error is plain error in the sense that a miscarriage of justice would otherwise result. *See, e. g., Luster v. Retail Credit Company,* 575 F.2d 609 at 617–618 (8th Cir. 1978); *Polk v. Ford Motor Co.,* 529 F.2d 259, 269 (8th Cir.), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976); *O'Malley v. Cover,* 221 F.2d 156, 159 (8th Cir. 1955); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2258, at 672 (1971).

▪ It is evident that ARA interposed no formal Rule 51 objection to the district court's instructions on punitive damages. Nor, in our judgment, was the question of the propriety of the instruction otherwise adequately brought before the district court. Under Rule 51 it is the responsibility of the parties to "distinctly" make their objections in a manner which affords the district court an opportunity to avoid error. *See* 5A Moore's Federal Practice § 51.04, at 2521. ARA failed to meet this burden. Counsel for ARA invited error, if there was any, by initially advising the district court of law to the effect that the jury could find punitive damages without awarding actual damages, and then later raising no objection in the instructions conference when it was clear that the district court was at that point receptive to a change in its punitive damages instructions if desired by the parties. *Cf. Mach v. Abbott Co.,* 136 F.2d 7, 10 (8th Cir. 1943). The fact that when called

on for formal exceptions ARA objected to the punitive damages instructions and then promptly withdrew the objection in the face of the district court's displeasure had, under the circumstances, no significance other than to serve as an acknowledgment by ARA that it had acquiesced in the proposed instructions. We hold that the course pursued by ARA failed to afford the district court an opportunity to scrutinize its punitive damages instructions in the light of clearly stated objections thereto.

▪ No objection to the punitive damages instructions having been made, we accept the district court's instructions as the law of the case to the extent they are not plainly erroneous. *See Polk, supra* at 269; *Johnson v. United States,* 434 F.2d 340, 343 (8th Cir. 1970), *quoting Coca Cola Bottling Co. v. Hubbard,* 203 F.2d 859, 862 (8th Cir. 1953); *Illingworth v. Industrial Molasses Corp.,* 272 F.2d 845, 847–48 (8th Cir. 1959). *See also Fisher v. Indiana Lumbermens Mutual Insurance Co.,* 456 F.2d 1396, 1400–01 (5th Cir. 1972).[4] It follows that unless it was plain error under Kansas law for a jury to award punitive damages but not actual damages in the present case, we will not disturb the district court's judgment on the first ground urged by ARA.

### B.

After close consideration of the relevant Kansas case law, we have concluded that the present case falls into that category of defamation actions, termed by the Supreme Court "an oddity of tort law," in which injury is presumed, with the result that Mid-America may be deemed by law to

---

4. If the question before us was simply the sufficiency of the evidence to support the punitive damage award, the district court's uncontested instructions would not provide the measuring rod for this Court on appeal. Where sufficiency of the evidence is in issue, "it is the applicable law which is controlling, and not what the trial court announces the law to be in his instructions." *Coca Cola Bottling Co. v. Hubbard,* 203 F.2d 859, 862 (8th Cir. 1953). The gravamen of ARA's appeal, however, is that as a matter of Kansas law punitive damages cannot stand alone. ARA raises sufficiency of the evidence only collaterally, arguing that there

was no evidence upon which actual damages could have been awarded. The unspoken premise of this argument is that Mid-America was required to prove actual damages in order to recover punitive damages. Our view of Kansas law, discussed in part I, B *infra,* that Mid-America was entitled to presumed damages and thus could recover actual damages without proof thereof, disposes of the premise and with it the sufficiency of evidence argument. In any event, there in fact was substantial evidence of damage to Mid-America's reputation in the testimony of those to whom the defamatory remarks were directed.

have established actual damages and a right to recover therefor. *Gertz, supra* 418 U.S. at 349, 94 S.Ct. 2997. So viewed, the predicate for the award of punitive damages in Kansas was apparently satisfied. Accordingly, we find no plain error in the district court's instructions or the jury's verdict.

■ As with most states, Kansas recognizes a distinction between defamation per se and defamation per quod. *See, e. g., Bradshaw v. Swagerty,* 1 Kan.App.2d 213, 563 P.2d 511, 513 (1977). The distinction rests on fundamental differences in the required proof of fault and damages under each concept.

■ Words defamatory per se are those which "intrinsically, without innuendo, impart injury . . . [w]ords from which damage by consent of men generally, flows as a natural consequence." *Bennett v. Seimiller,* 175 Kan. 764, 267 P.2d 926, 929 (1954). *See, e. g., Sweaney v. United Loan and Finance Co.,* 205 Kan. 66, 468 P.2d 124, 129 (1970); *Chauffeurs, Teamsters and Helpers Local 795 v. Kansans for Right to Work,* 189 Kan. 115, 368 P.2d 308, 313–14 (1962). Where the alleged defamation is of the per se variety, actual damages are "conclusively presumed" and Kansas courts are required to take "judicial notice" of their existence. *Bennett, supra* 267 P.2d at 929. *See Carey v. Piphus,* 435 U.S. 247, 262 & n. 17, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

The term "per se" also carries with it connotations of strict liability, for in Kansas malice has historically been implied from the use of language which is defamatory

per se. *See Bennett, supra* 267 P.2d at 929. *See also* W. Prosser, Law of Torts, § 112, at 763 (4th ed. 1971). It was this strict liability aspect which most concerned the district court. As the trial court stated in its order overruling ARA's alternative motion for judgment notwithstanding verdict or for a new trial:

> This Court's primary concern related to the Supreme Court's opinion that state suits for slander per se were no longer actionable without proof of malice; that is, knowledge of falsity or reckless disregard for the truth.

The cases to which the district court made reference, most particularly *Gertz,* stand for the proposition that in a defamation action against the press or broadcast media, a state may not "impose liability without fault" and "may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Gertz, supra,* 418 U.S. at 347, 349, 94 S.Ct. at 3011. Counsel for Mid-America shared the trial court's concern in this regard and did not press a theory of slander per se.

We need not and do not state an opinion with regard to the applicability of the Supreme Court's media defamation cases in the non-media defamation context.[5] We emphasize only that regardless of any effect *Gertz* and similar cases may have on the Kansas law of non-media defamation, nothing the Supreme Court has said would vitiate the presumed damage aspect of defamation per se so long as a constitutionally acceptable fault standard is applied, as it

**5.** By its terms the Supreme Court's decision in *Gertz* was predicated on an accommodation of the competing interests of freedom of the press and an individual's right to compensation for a wrongful injury. 418 U.S. at 343, 94 S.Ct. 2997. A similar balancing would necessarily precede an extension of the *Gertz* standards to embrace defamation by the spoken or written word in which there is no media involvement. *Cf. Garrison v. Louisiana,* 379 U.S. 64, 72 n.8, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). We would note in this regard that freedom of the press presupposes freedom of speech, and extends

the concept by recognizing a right not only to speak freely, but to memorialize and disseminate the words uttered in the broadest possible way. There are thus particularly compelling reasons for "[shielding] the press and broadcast media from the rigors of strict liability for defamation" or the chilling effect of unwarranted presumed or punitive damage awards. *Gertz, supra* 418 U.S. at 348, 94 S.Ct. at 3011. *See generally, National Bank of Boston v. Bellotti,* —— U.S. ——, ——, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

was here.[6] Indeed the Supreme Court has, at least by implication, recently appeared to recognize the continuing viability of presumed damages as an element of defamation per se. *Carey, supra* 435 U.S. at 262, 98 S.Ct. 1042.

The central question is whether this is a case in which the presumed damage aspect of defamation per se is applicable under Kansas law. Preliminarily, the Court notes that in Kansas this appears to be a question of law. *See Munsell v. Ideal Food Stores,* 208 Kan. 909, 494 P.2d 1063, 1074 (1972); *Wallingford v. Zenith Radio Corp.,* 310 F.2d 693, 695 (7th Cir. 1962); *Jerald v. Houston,* 124 Kan. 657, 261 P. 851, 852 (1927). *See also Pollard v. Lyon,* 91 U.S. 225, 227, 23 L.Ed. 308 (1876). *But cf. Luster, supra,* 575 F.2d at 616–617 (interpreting Arkansas law). We believe the statements attributed to ARA constituted slander per se in the sense that plaintiff Mid-America was entitled to the benefit of presumed damages. Four categories of slander per se have been recognized in Kansas: "imputation of a crime; imputation of a loathesome disease; words reflecting on plaintiff's fitness for his office, profession, or trade; and the imputation of unchastity in a woman." *Bradshaw, supra* 563 P.2d at 513. ARA's agent was alleged to have said, in essence, one or both of two things:[7] that Mid-America "had almost been shut down by the health department" or words to that effect; and that Mid-America "was having financial problems and probably could not perform the contract." It seems apparent that both statements reflected adversely on Mid-America's fitness for its trade. Moreover, the rationale supporting presumed damages is pertinent here. Whether these statements are intrinsically injurious depends on whether the statements impart injury without reference to the extrinsic facts that Mid-America and ARA were business competitors bidding on the same food service contract and that the statements were made to those who would let the contract; and without a showing that the words were understood by listeners to imply that Mid-America was an unsatisfactory candidate. *See Bennett, supra,* 267 P.2d at 928. *Cf.* W. Prosser, Law of Torts § 111, at 748 (4th ed. 1971). Assertions that a food service establishment is in financial difficulty and has almost been closed by the health department appear to us damaging to reputation without proof of context or the meaning assigned to the statements by listeners. Consequently, Mid-America was entitled to have had the district court take judicial notice of damage to its reputation and instruct the jury that ARA's statements were defamatory as a matter of law.

If Mid-America may be considered to have suffered damage as a matter of law, the final inquiry is whether that is sufficient to support an award of punitive damages alone. The parties have not referred us to any Kansas case law on point and we have discovered none by our independent efforts. Though the question is a close one, we believe that Kansas courts would conclude that because Mid-America was entitled to presumed damages, it thereby established actual damages and a right to recover therefor sufficient under Kansas law to support the jury's punitive damage award, notwithstanding the absence of an award of actual damages. *See Dotson v. McLaughlin,* 216 Kan. 201, 531 P.2d 1, 9 (1975).

There is language in relatively early Kansas case law which if read in isolation ap-

---

6. The jury was instructed that it could not return a verdict for *any* damages, actual or punitive, unless it first found that ARA's agent Coleman stated a defamatory falsehood with knowledge of its falsity or reckless disregard for the truth. *See Gertz v. Robert Welch, Inc.,* 418 U.S. at 349, 94 S.Ct. 2997; *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

7. The district court's instructions told the jury that they must find ARA's agent made one or more of four alleged defamatory statements before finding for Mid-America. Three of these statements were variations on the theme that Mid-America had almost been shut down by the health department.

pears to indicate that punitive damages may not be recovered absent an award of substantial actual damages. *See, e. g., Behymer v. Milgram Food Stores, Inc.,* 151 Kan. 921, 101 P.2d 912, 913–14 (1940); *Shore v. Shore,* 111 Kan. 101, 205 P. 1027, 1028 (1922). *See also Schumock v. Meerian,* 175 Kan. 8, 259 P.2d 173, 175 (1953); *Lewis v. Victory Oil Co.,* 170 Kan. 660, 228 P.2d 709, 712 (1951). But more recent Kansas cases have made it clear that the prerequisite to punitive damages is not so much a matter of gaining an award of actual damages from the jury, as it is sustaining the burden of proof on actual damages. A focus on the burden of proof is significant where damages are presumed from a defamatory act.

In *Reeder v. Guaranteed Foods, Inc.,* 194 Kan. 386, 399 P.2d 822 (1965), a fraud case, the Supreme Court of Kansas observed:

> Not having sustained the burden of proof to establish actual damages . . the appellees cannot recover punitive damages. Before exemplary or punitive damages may be awarded, *the party upon whom the burden of proof is cast must establish actual damages and the right to recover therefor.* (Emphasis added.)

*Id.* at 831. *See Dotson, supra* 531 P.2d at 9; *Stoner v. Wilson,* 140 Kan. 383, 36 P.2d 999, 1005 (1934).

Applying the burden of proof perspective articulated in *Reeder* to the present case, inasmuch as Mid-America may be deemed conclusively presumed to have suffered damages upon proof that ARA's agent Coleman made the slanderous statements, the jury's finding that Coleman in fact made the actionable statements with knowledge of their falsity or reckless disregard for their truth permitted the jury to award punitive damages. The finding of fact that Coleman maliciously made statements which were slanderous per se was dispositive, for actual damages and a right to recover them arose as a matter of law from the jury's factual findings incident to the award of punitive damages. *See Reeder, supra,* 399 P.2d at 831; *Bennett, supra* 267 P.2d at 929.[8]

▆▆▆▆ The Court is persuaded that this analysis is appropriate under Kansas law in the peculiar circumstances here for otherwise it would be difficult to fit the presumed damage aspect of defamation per se into the general framework of punitive damages in tort law. In most tort actions the jury determines both whether there have been actual damages, and if so, how much money is sufficient to compensate for the injury. These findings are reflected in the jury's award of actual damages. However, as Kansas has held, where defamation per se is implicated, the jury's function is, in effect, bifurcated and a part thereof assigned to the court. Assuming the jury finds that slanderous statements were made, the question of whether plaintiff has been damaged is resolved as a matter of law by the court if the statements are defamatory per se. The injury results from the fact that the statements were made. It is for the jury to determine only the compensatory amount. It follows that where, by awarding punitive damages, the jury has found a defendant to have made statements deemed defamatory per se, the jury's failure at the same time to award actual damages should not annul the award of punitive damages. Otherwise the conclusive presumption of damages arising from the jury's finding that the defendant made the statements is stillborn.

**8.** The district court instructed the jury they could award punitive damages regardless of whether they awarded actual damages. Wholly apart from the propriety of such an instruction under Kansas law, it would in any event have been better not to invite the jury to return punitive damages alone. We strongly suspect that the district court's instruction may have led to confusion among the jury, and a punitive damage award which in reality was intended to compensate Mid-America for damage to its reputation. We note that in defamation actions, the concept of reputational damages is no less amorphous than that of punitive damages. *See Carey v. Piphus,* 435 U.S. 247, 262, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Gertz v. Welch,* 418 U.S. at 349, 94 S.Ct. 2997. Moreover, because the district court employed the same fault standard to any damage award the jury might make, the line between actual and punitive damages here is particularly indistinct.

Against the peculiar allocation of roles worked by the concept of defamation per se must be applied the general Kansas rule that to recover punitive damages the burdened party, *inter alia*, "must establish actual damages and the right to recover therefor." *Reeder, supra*, 399 P.2d at 831. The jury's limited inquiry of how much damages is not necessarily determinative of whether damages are established or a right to recover shown. "Establish" looks to the existence of damages; "right to recover" means no more than right to receive an actual damage award—both inquiries logically inhere in a conclusive presumption of damages. Accordingly, we feel that in the circumstances of this case the Supreme Court of Kansas would be likely to hold that where damages may be deemed conclusively presumed as a matter of law, the injured party has met its burden as it relates to actual damages and may recover punitive damages. *Cf. Porterfield v. Burger King Corp.*, 540 F.2d 398, 402–03 (8th Cir. 1976). Though we recognize that Kansas courts might adopt a different perspective, our view of the probable application of Kansas law compels us to conclude that the district court did not commit plain error in instructing the jury on punitive damages.

## II.

ARA raises two other issues which are closely related and may be treated together. It asserts that the district court incorrectly instructed the jury on the definition of "malice" under Kansas law, and that the district court erred in ruling that the statements made by ARA's agent Coleman were not qualifiedly privileged.

■ Punitive damages could not be recovered unless ARA defamed Mid-America with malice. In this regard, ARA proffered a standard for express malice founded on a 1972 Kansas Supreme Court case: "actual evilmindedness or specific intent to injure." *Munsell, supra*, 494 P.2d at 1073. Mid-America argued for, and the district court adopted, a standard found in a 1976 case: "knowledge that the defamatory statement was false or with reckless disregard of

whether it was false or not." *Schulze, supra*, 545 P.2d at 399. The *Schulze* standard is that articulated by the United States Supreme Court to protect First Amendment interests in the media defamation context. *See New York Times, supra*, 376 U.S. at 279, 84 S.Ct. 710. Both *Munsell* and *Schulze* dealt with the degree of fault necessary to overcome a defense of qualified privilege, not the requisite fault for punitive damages. *Schulze* did not purport to overrule *Munsell*.

We agree with the district court that *Schulze* is more authoritative, for it is axiomatic that more recent judicial pronouncements prevail in conflicts with earlier statements, and it is not surprising that a state would choose to adopt an evolving federal definition of malice. Moreover, the Supreme Court of Kansas has reiterated the knowledge of falsity or reckless disregard standard in the qualified privilege context on at least one occasion since *Schulze. Bradford v. Mahan*, 219 Kan. 450, 548 P.2d 1223, 1228 (1976).

■ Whether *Munsell* or *Schulze* is more authoritative is helpful but not controlling on the subject of punitive damages. The malice necessary to overcome a qualified privilege is not necessarily synonymous with the common law fault standard for punitive damages. *See Schulze, supra*, 545 P.2d at 399. *See also Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 251–52, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974). Our review of Kansas law convinces us, however, that there is no functional distinction between "knowledge of falsity or reckless disregard" and the traditional common law punitive damages standard employed in Kansas. In *Sweaney v. United Loan and Finance Co., supra*, a combined assault, slander and false arrest action, the Supreme Court of Kansas stated:

He . . . ignored Sweaney's basic rights and took the law into his own hands in such a manner as to evince reckless indifference and disregard of the rights of others, or constituted such gross and wanton conduct as to justify the jury in awarding substantial punitive dam-

ages. Generally, the intentional doing of a wrongful act with full knowledge of its character, and without cause or excuse, is malicious and warrants an award of exemplary damages.

*Id.* 468 P.2d at 131. *See Ford v. Guarantee Abstract and Title Co.,* 220 Kan. 244, 553 P.2d 254, 268–69 (1976); *Watkins v. Layton,* 182 Kan. 702, 324 P.2d 130, 135 (1958). It is apparent from the above-quoted language that "punitive damage malice" under Kansas law contemplates the same reckless or intentional acts reflected in the *New York Times* standard for "First Amendment malice" and its progeny, including *Schulze.*

■ Lastly, ARA asserts the district court erred in finding that its agent Coleman's statements were not qualifiedly privileged. Whether the defense is available is ordinarily a question of law for the court. *Munsell, supra,* 494 P.2d at 1073.

> The essential elements of a conditionally privileged communication may . . . be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.

*Senogles v. Security Benefit Life Insurance Co.,* 217 Kan. 438, 536 P.2d 1358, 1363 (1975). *See Bradford, supra* 548 P.2d at 1229.

■ Preliminarily, even if we disagreed with the district court, the error would be harmless, for in awarding punitive damages the jury found that ARA acted with the requisite malice to overcome a qualified privilege. *See Schulze, supra* 545 P.2d at 399. In any event, ARA cannot claim qualified privilege here. The only reasonable inference from the evidence in the case was that Coleman's statements were made in an effort to further the business interests of ARA by securing advantage over a competitor through injury to the competitor's reputation. ARA's pecuniary interest in this context is not an interest entitled to the protection of qualified privilege. *See Aetna Life Insurance v. Mutual Benefit Health and Accident Assoc.,* 82 F.2d 115, 119 (8th Cir. 1936); Restatement (Second) of Torts § 594, Comment g (1976); 50 Am.Jur.2d § 198, at 703. Moreover, the fact that Coleman waited until Mid-America's agent had departed the meeting at which the bids were awarded before impugning Mid-America's ability to perform the contract is persuasive evidence that publication was not made in good faith or in a proper manner. The district court did not err in ruling against qualified privilege.

Because the district court's instructions were not plainly erroneous, and no other error appearing, we affirm.

Affirmed.