Wayne D. NORTON, Plaintiff-Appellee,

v.

CAREMARK, INC., Baxter Health Care Corporation, Defendants-Appellants.

No. 92-2891MN.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 12, 1993.

Decided March 30, 1994.

Thomas P. Kane, St. Paul, MN, argued
(Ross F. Plaetzer, Kevin M. Lindsey and

Thomas P. Kane, on the brief), for appellants.

Seymour J. Mansfield, Minneapolis, MN, argued (Teresa J. Ayling and Sholly A. Blustin, on the brief), for appellee.

Before BOWMAN, Circuit Judge, LAY, Senior Circuit Judge, and CAMPBELL, Senior Circuit Judge.*

LEVIN H. CAMPBELL, Senior Circuit Judge.

Appellee Wayne Norton brought action in 1990 alleging that defendants Baxter Travenol Laboratories ("Baxter") and its then-subsidiary Caremark, Inc. ("Caremark"), had violated Norton's employment contract by discharging him without following certain procedures allegedly required in the contract. The case was tried before a jury in the United States District Court for the District of Minnesota.[1] The jury returned a verdict finding Baxter and Caremark liable for breach of contract and awarding Norton $305,000 in back pay. The district court denied defendants' motions for judgment as a matter of law and for a new trial or a remittitur. The defendants appeal, and we affirm.

## I.

Travenol Laboratories ("Travenol"), a subsidiary of Baxter, hired Norton in 1978 as a sales representative to sell medical care products to hospitals in the Des Moines, Iowa, region. In 1981, Travenol transferred Norton to Minneapolis. In 1986, Norton was promoted to general manager of the Minneapolis Branch Sales Office. In 1987, after Baxter acquired its competitor Caremark, Baxter combined the companies' two Minneapolis sales offices and named Norton as general manager of the consolidated office.

When Norton began work for Travenol in 1978, he signed a document entitled "Employment Agreement," which stated in part: "Either Travenol or I may terminate my employment at any time." At some point in the early 80s, Travenol issued a "Work Rule Policy & Handbook" ("the Handbook"). The Handbook outlined the procedures to be followed when an employee's performance or behavior was unacceptable. The Handbook stated that it was the policy of the company to use "corrective discipline" with employees. According to the Handbook, "discharge [would] be resorted to only where previous efforts by Management to bring about correction have failed, or where discharge [was] the only appropriate action ... because of the nature of the employee's gross misconduct."

The Handbook divided conduct violations into two categories: "major" offenses and "serious" offenses. Major offenses were those, like theft or the possession of a firearm, for which discharge would be appropriate for the first violation. For serious offenses, like wasting time on the job or absence without good cause, the employee would be subject to "corrective discipline" consisting of a four-step procedure. The first serious offense in a twelve-month period would result in an verbal warning; the second would result in a written warning; the third, in a suspension or probation. The fourth serious offense in twelve months could result in discharge.

The Handbook dealt not only with misconduct and violations of work rules but also with the procedures to be followed when the performance of a manager or other salaried employee was deficient. The Handbook stated that the "first remedial steps" in such a situation "should always be in the nature of personnel training and counseling." In the event performance did not improve, the Handbook suggested that a supervisor conduct an interview with the employee during which a "Performance Program" would be outlined, detailing "the areas of deficiency and specify[ing] what 'acceptable performance' would include." The performance program should cover a minimum of 30–60 days, to "give the individual affected ample time to show improvement." If the employee was "either unwilling or unable to satisfy the standards set forth in the program," the Handbook warned that "termination may result." The Handbook pronounced, however, that "[n]o employee is to be discharged due

---

* The HONORABLE LEVIN H. CAMPBELL, Senior United States Circuit Judge for the First Circuit, sitting by designation.

1. The Honorable Paul A. Magnuson, U.S. District Judge for the District of Minnesota.

to unaccepted job performance unless there is on file a record of one or more deficiency interviews."

After Baxter acquired Caremark, Caremark promulgated in June, 1989, its own personnel policy relating to pre-termination procedures for employees. A memorandum from Sheldon Asher, an Executive Vice President of Caremark, and Richard Brown, Caremark's Human Resources Director, was distributed to area vice presidents and to general managers enclosing so-called Disciplinary Action Guidelines ("the Guidelines"). These were to be followed, the memo said, when an employee "deviate[s] below an acceptable level of performance." The memo stated that "at the first hint of unacceptable performance," "[a] verbal warning should be issued, and a work improvement discussion conducted." Such a procedure, according to the memo, was "an important management responsibility" that was "owe[d] to the employee."

The Guidelines went on to define the procedures involved in administering what the memo called "progressive discipline." The process was to involve four steps: (1) a verbal warning along with a "work improvement discussion"; (2) a written warning; (3) a performance program, along with a written acknowledgment by the employee that the program was the final corrective step; and (4) termination. The Guidelines emphasized that each step of the discipline procedure should be documented and warned that in connection with a termination, "procedure and policy must be adhered to strictly." Adherence to the Guidelines, according to the memo, was "important in avoiding fines and re-instatement potentially dictated by the legal system."

The Guidelines allowed for some flexibility. According to the Guidelines, "based on the severity of the situation," it might be "necessary to combine one or two of the steps in the process and proceed on an accelerated timetable." Also, the memorandum explained that there were "situations" where the Guidelines were "inappropriate and a different course of action [was] warranted." Examples of such situations included "a complete mismatch between job responsibilities

and employee abilities, gross misconduct, and job elimination."

Norton learned about the above policies in the course of his work for Travenol, Baxter, and Caremark. At trial he testified that soon after he was promoted to general manager in 1986, he attended a branch manager's meeting where a Human Resources representative distributed and explained the Handbook. He further testified to receiving training on two other occasions in the procedures contained in the Handbook. The Guidelines and memorandum from Asher and Brown were distributed to Norton in his capacity as general manager.

In the summer and fall of 1989, Caremark's midwest area vice president, Joe Herring, became dissatisfied with Norton's performance as general manager. Norton was blamed for the Minneapolis office's unsatisfactory financial results and poor morale. According to Norton, the financial results were not as bad as they appeared, and the morale problems resulted from the earlier merger of Caremark and Baxter.

Over the course of the fall months of 1989, Norton and Herring met several times to discuss the performance of the branch office. The accounts of these meetings differ. It appears, in any case, that the meetings and communications between Herring and Norton did not satisfy the "progressive discipline" procedures set out in the Handbook and the Guidelines. Richard Brown, the Human Resources Director for Caremark, admitted at trial that the documentation of the discussions "was not in strict compliance" with the Guidelines. Herring, too, admitted that he never provided Norton with a written warning that satisfied the requirements of the Guidelines.

Two documents introduced at trial also indicate that Herring had not followed the outlined disciplinary procedures. The first document, a memo from Herring to Brown, Asher, and others ("the Herring memo"), contains an admission that the documentation surrounding Herring's discussions with Norton was not "in strict compliance with the [Guidelines]." The second document ("the chronology") was a chronology of the rele-

vant events prepared by Carolyn Bowden, a manager in the Caremark Human Resources Department. Bowden related that in August, 1989, Herring had told her that he wished to place Norton "on a performance program." Bowden recommended that Herring document the performance program, because without such documentation "there was always the potential of exposure for a lawsuit." According to the chronology, Herring told Bowden that he felt documentation was unnecessary as he could more effectively deal with Norton verbally.

On November 1, 1989, Herring terminated Norton. Norton subsequently sued Baxter and Caremark for breaching its employment contract embodied in the Handbook and Guidelines.

## II.

The principal issues are whether the various stated personnel policies of Baxter and Caremark had become a part of Norton's contract of employment, and if so, whether there was evidence legally sufficient for the jury to find that, in terminating Norton, Baxter and Caremark had violated that contract. These issues arise in the context of defendants' appeal from the district court's denial of their motions for judgment as a matter of law and for a new trial.

## A.

█ Courts of appeal review *de novo* the denial of a motion for judgment as a matter of law, applying the same standard as the district court. *Minneapolis Community Dev. Agency v. Lake Calhoun Assoc.*, 928 F.2d 299 (8th Cir.1991). This standard requires them to

> consider the evidence in the light most favorable to the prevailing party [Norton], assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and [uphold the] den[ial of] the motion, if in light of the foregoing, reasonable jurors could differ as to the

conclusion that could be drawn from the evidence.

*Id.*, quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 989 (8th Cir.1989).

█ We review the denial of the motion for a new trial "only for a showing of clear abuse of discretion." *Grogg v. Missouri Pac. R.R. Co.*, 841 F.2d 210, 214 (8th Cir.1988). When such a motion is based on the argument that the verdict was "against the weight of the evidence," the denial of a new trial motion "is virtually unassailable on appeal," *id.*, as "[t]he authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980).

## B.

█ Under Minnesota law, which all parties agree is controlling, the question of whether Baxter's and Caremark's personnel policies became a part of Norton's employment contract turns on several factors. In *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983), the Minnesota Supreme Court applied contract principles to hold that "an employee handbook may constitute terms of an employment contract if (1) the terms are definite in form; (2) the terms are communicated to the employee; (3) the offer is accepted by the employee; and (4) consideration is given." *Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 707 (Minn.1992), citing *Pine River*, 333 N.W.2d at 626–27.

Baxter and Caremark, on appeal, do not contest that there was evidence sufficient for the jury to find that each of the last three of these factors was satisfied here. Given the Minnesota Supreme Court court's discussion in *Feges*, a case bearing a number of similarities to the present, defendants' acquiescence as to these three factors is certainly understandable.

█ In this context, the sole question for our consideration, therefore, is whether the Handbook and the Guidelines met the first *Pine River* requirement, that is, whether they were sufficiently "definite in form" to

constitute a legal offer. *Pine River,* 333 N.W.2d at 626. The district court treated definiteness as a question of law, relying on *Hunt v. IBM Mid America Employees Fed. Credit Union,* 384 N.W.2d 853, 856 (Minn. 1986) (when an employee relies exclusively on the language contained in an employee manual to establish the existence of a contract, the resolution of the definiteness issues is for the court). *See also O.R.S. Distilling Co. v. Brown–Forman Corp.,* 972 F.2d 924, 926 (8th Cir.1992) (existence of a contract is a jury question "only to the extent that the facts surrounding the alleged contract are in dispute"; where relevant facts are not in dispute, the existence of a contract is a question of law for court). None of the parties disagrees with the court's retention of the question, as one for itself to determine.

However, Baxter and Caremark strenuously disagree with the district court's ultimate ruling on the question. The court told the jury:

> When a plaintiff relies exclusively on the language contained in an employee manual, the determination of whether language in a handbook is sufficiently definite to constitute an offer is for the court. *You are instructed that the handbooks in this case are sufficiently definite to constitute an offer.* Therefore the plaintiff has satisfied this element of his claim. [Emphasis supplied]

As Baxter and Caremark did not object to this instruction at trial, Norton now argues that our consideration of the definiteness issue is limited to review for plain error only. *See* Fed.R.Civ.P. 51; *Herndon v. Armontrout,* 986 F.2d 1237, 1240 (8th Cir.1993) (appellate court should review jury instructions for plain error when party failed to object at trial).

Baxter and Caremark concede they did not object to the instruction, but argue they preserved the definiteness issue for appeal through their motion *in limine* and their motion for judgment as a matter of law. The motion *in limine,* however, offers them no help, as it appears to have asked simply that the court itself make the definiteness ruling rather than let the jury do so. The court, in fact, did as requested. If defendants felt it

reached the wrong result, they should have objected to the instruction.

Defendants' motion for judgment as a matter of law, filed after verdict, asked the court to set aside the verdict on the ground that "the evidence introduced by plaintiff failed to prove the existence of any contract that modified [the at-will contract with Norton]." Neither the motion nor defendants' accompanying memorandum specifically referenced the Handbook as insufficiently definite. Accordingly, the motion could hardly have preserved the Handbook's alleged lack of definiteness and the appellants do not in fact press that argument on appeal. The memorandum did argue, however, that the Guidelines failed the definiteness test. We do not think, however, that by arguing the point in a memorandum to this post-trial motion, defendants overcame their failure to have objected to the court's prior jury instruction "that the handbooks in this case are sufficiently definite to constitute an offer."

In *Mid–America Food Service, Inc. v. ARA Services, Inc.,* 578 F.2d 691 (8th Cir. 1978), this circuit refused to permit "[a]lleged errors of law rooted in the trial court's instructions" to be "resurrected by post-trial motion." *Id.* at 695. The jury instructions in that case had allegedly contained a misstatement of Kansas law, and the appellant argued on appeal that it was not in fact challenging the instruction but rather the judgment on the jury's verdict. As in the instant case, the appellant in *Mid–America* "apparently view[ed] its post-trial alternative motion for judgment notwithstanding verdict [now known as 'judgment as a matter of law'] or for a new trial as preserving this issue for review." *Id.* at 695. We held that "Rule 51 ... is not so easily circumvented." *Id. See DeHues v. Western Electric Co.,* 710 F.2d 1344, 1346 (8th Cir.1983) (not enough to preserve issue on appeal that non-objecting party had presented his theory in trial brief.) *See also Rogers v. Baltimore & Ohio R.R. Co.,* 325 F.2d 134, 136 (6th Cir.1963) (where district court withdrew from the jury certain factual issues and proceeded to charge the jury on the remaining issues of fact, counsel's failure to object to jury charge could not be rectified by fact that counsel had argued

against the court's withdrawal of the issues from the jury).

The offending instruction presented with utmost clarity the legal issue which Baxter and Caremark now argue. Immediately following his instruction of the jury, the district judge asked counsel to approach the bench and if there were "any further matters to come to our attention before we release the jury." The defendants did not lodge an objection. Because of their failure to follow Rule 51, we are satisfied that the plain error standard governs our review of the district court's determination of the definiteness issue.[2]

 Under a plain error standard of review, we may reverse the district court's determination only if the alleged error "so seriously affected the fairness or integrity of the trial that it produced a miscarriage of justice." *Herndon*, 986 F.2d at 1240. Under this standard, Baxter and Caremark must fail on the definiteness issue: even assuming *arguendo* that it was erroneous for the district court to determine that the Handbook and the Guidelines were definite, the error was hardly so "plain" as to have produced a "miscarriage of justice."

Indeed, the district court's determination was arguably altogether consistent with the applicable Minnesota precedents: *Pine River*, 333 N.W.2d 622; *Hunt*, 384 N.W.2d 853; and *Lewis v. Equitable Life Assurance Soc'y of the United States*, 389 N.W.2d 876 (Minn. 1986).

Based on these cases, the key question as to definiteness is, as our Circuit has stated in an earlier decision, whether the employee manuals or guidelines at issue "lack terms sufficient to enable a factfinder to determine whether a breach has occurred." *See Miller v. Certainteed Corp.*, 971 F.2d 167, 172 (8th Cir.1992), citing *Hunt*, 384 N.W.2d at 857. In the case at hand, it was not plain error for the district court to hold that the Handbook and the Guidelines were sufficiently definite to constitute an offer as, read together, it is certainly arguable they contained "language definite enough to permit a jury to conclude that [Norton] received certain contractual rights." *Lewis*, 389 N.W.2d at 883.

In fact, Baxter and Caremark do not seriously question the definiteness of the Handbook. Like the handbook in *Lewis*, the Baxter Handbook limited the use of discharge to situations when "previous efforts" to correct a problem had failed or when the employee had committed a "major offense" or engaged in "gross misconduct." Unlike the handbook in *Hunt*, which "neither define[d] nor [gave] examples" of the types of offenses that would justify immediate termination, 384 N.W.2d at 857, the Baxter Handbook listed sixteen examples of "major offenses" and twenty-three examples of the lesser category of "serious offenses." Moreover, similar to the definitive language in the *Pine River* handbook—"[i]n no instance will a person be discharged from employment without a review of the facts by the Executive Officer"—the Baxter Handbook included the statement that "[n]o em-

2. Prior to the verdict and the jury charge, at the close of the evidence, defendants also moved for judgment as a matter of law on grounds similar to those in their post-trial motion, and—as there—with a supporting memorandum challenging the definiteness of the Guidelines. The court did not rule on that motion until after the verdict. On the definiteness issue, however, it made its position unmistakably clear in the jury instruction. We do not think the mere fact defendants presented their legal position prior to the jury charge suffices to stake out a separate route for appeal, bypassing any need to have observed Rule 51. *See DeHues*, 710 F.2d at 1346 (making theory of case clear in trial brief insufficient to preserve right to appeal where jury instructions not objected to). Here the court reserved decision on defendants' first motion until after verdict. In the instruction, however, the court crystallized its view on the challenged

point with complete clarity. By registering a timely Rule 51 objection, the defendants would have allowed the court to reconsider its thinking at a time when, had the court wished, it still could have altered its position without the necessity of a new trial.

The purpose of Rule 51 is precisely to ensure that the court is given such an option.

"The object of this rule is to afford the trial judge an opportunity upon second thought, and before it is too late, to correct any inadvertent or erroneous failure to charge. The rule also serves to lessen the potential burden of appellate courts by diminishing the number of rulings at the trial which they may be called upon to review."

Wright & Miller, Federal Practice and Procedure: Civil § 2551 (1971 and Supp.1993) (quoting *Marshall v. Nugent*, 222 F.2d 604, 615 (1st Cir.1955)).

ployee is to be discharged due to unaccepted job performance unless there is on file a record of one or more deficiency interviews." These provisions certainly limited "the right to freely dismiss employees," *Lewis*, 389 N.W.2d at 883, and might be considered definite enough to enable a jury "to determine whether a breach [had] occurred." *Miller*, 971 F.2d at 172.

Though the definiteness of the Guidelines is a closer question, the district court's determination that they were sufficiently definite to constitute an offer can scarcely be viewed as a miscarriage of justice. The Guidelines warned that in connection with a termination "procedure and policy must be adhered to strictly," and that the progressive discipline procedures were "an important management responsibility" that was "owed to the employee."

Baxter and Caremark argue that certain provisions in the Guidelines—specifically those provisions that allowed them to consolidate disciplinary steps "based on the severity of the situation" and that allowed them to bypass the procedures completely in "situations" where there was "a complete mismatch between job responsibilities and employee abilities"—gave them such discretion as to destroy the definiteness of any offer. Appellants' argument is of doubtful force. As we read *Pine River, Hunt,* and *Lewis,* the definiteness requirement does not mandate that the employee manuals dictate a predetermined response in every situation. It is enough that the Guidelines "clearly limit[ ] the [employer's] right to freely dismiss employees and plainly state[ ] that *in certain circumstances* all employees are entitled to a warning and to a probationary period prior to dismissal." *Lewis*, 389 N.W.2d at 883 (emphasis supplied). It was not plain error for the district court to find that the Guidelines satisfied this standard.

### C.

■ With the four *Pine River* elements satisfied, the Handbook and the Guidelines could properly be considered part of Norton's contract of employment with Baxter and Caremark. We turn next to whether, as found, Baxter/Caremark broke that contract in terminating Norton. This question was in the first instance an issue for the jury, and our review of its verdict is only to determine whether the verdict was supported by substantial evidence, viewed in the light most favorable to sustaining the verdict. *Herndon*, 986 F.2d at 1240.

Baxter and Caremark do not contend that they followed the "progressive discipline" procedures outlined in either the Handbook or the Guidelines. They nevertheless insist that there was no basis for the jury to find that they had violated Norton's employment contract. They argue, first, that the Handbook did not require that they provide Norton with progressive discipline, as the Handbook dealt only with violations of work rules and was not intended to address performance-related concerns. Second, they argue that Norton's termination fell within one of the exceptions to the procedures identified in the Guidelines. We do not find these arguments persuasive.

Appellants' argument that the Handbook relates to work rules only, rather than performance deficiencies, and therefore should not be applied to Norton's termination, is belied by the Handbook itself. One section of the Handbook is entitled "Employee Deficiency Interview/Performance Program, Salaried–Exempt Personnel." This section clearly contains procedures to be followed when employees have performance problems: the section warns that "[n]o employee is to be discharged *due to unaccepted job performance* unless there is on file a record of one or more deficiency interviews."

Baxter and Caremark contend that this section of the Handbook should not apply because, when Norton testified at trial, he referred to the work rule portion of the Handbook in describing the "progressive discipline" procedures that would apply to his termination. This argument, too, is unpersuasive. The portions of the Handbook that were entered into evidence contained information on performance deficiencies as well as violations of work rules. The jury was certainly free to consider the Handbook as a whole rather than merely the snippets specifically cited by Norton in his testimony.

Moreover, as we read the transcript, it is hardly clear that Norton believed that the performance deficiency provisions did not apply to him. In answer to counsel's direction to read from certain pages of the Handbook that outlined the progressive discipline procedures, he did so. On one view—a view the jury was entitled to hold—his citation of the work rule provisions did not imply that he believed only those sections applied to him.

Baxter's and Caremark's second argument, that Norton's termination fell within one of two exceptions to the procedures identified in the Guidelines, is similarly unavailing. Norton's supervisor, Joe Herring, testified that he bypassed the progressive discipline procedures because he decided there was a "mismatch" between Norton's abilities and responsibilities. Baxter and Caremark argue, alternatively, that Herring simply combined disciplinary steps, as the Guidelines permitted, "based on the severity of the situation."

Both of these contentions, however, were belied by the testimony of Richard Brown, Caremark's Human Resources Director. Brown testified that "this wasn't a mismatch situation" and that the alleged "severity" of Norton's situation did not influence the decision to terminate Norton without proceeding through the various steps of the progressive discipline procedure:

Q: First of all, sir, when we're talking about poor performance, tell us what would indicate an increase in the severity of the situation or a decrease in the severity of the situation.

[Brown]: For a General Manager, I think in general we're looking at profitability at the branch....

Q: Okay. So if the severity was really, really serious and really urgent, the company would be losing its shirt ...? That would be very severe?

A: It might represent a gross mismatch between employee ability and responsibilities of the job, yes.

Q: But we've already established, you've already said this wasn't a mismatch situation?

A: Right.

....

Q: .... [D]id you make a determination that the situation was so severe with regard to Mr. Norton that the verbal warning, work improvement discussion steps should be skipped?

A: I don't think we skipped any of the steps in terms of intent.

....

Q: Okay. And there was no question of severity of the situation or combination of one or two steps that entered your thinking as to that, correct, sir?

....

A: Severity of the situation was no different than other general managers potentially with a branch in trouble.

Q: And it didn't enter into the fact of whether Mr. Norton got one or two or three steps, is that correct?

A: Yes.

Trial Tr. at 1471–73. As the jury was entitled to believe Brown rather than Herring, it was similarly entitled to find that neither of the asserted exceptions to the procedures applied and that defendants had therefore breached the contract.

### III.

Baxter and Caremark argue that they are entitled to a new trial because the district court erred in making certain evidentiary rulings: (1) admitting into evidence the Herring memo and the chronology; and (2) allowing an expert witness to testify on Norton's behalf on the issue of lost-pay damages. We consider these arguments in turn.

We note first that our review of the district court's evidentiary rulings is quite circumscribed. "A trial judge has wide discretion in ruling on the admissibility of evidence and his decisions will not be disturbed unless there is a clear and prejudicial abuse of discretion." *Maddox v. Patterson*, 905 F.2d 1178, 1179 (8th Cir.1990). Moreover, "[n]o error in ... the admission ... of evidence ... is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does

not affect the substantial rights of the parties." *Id.*

### A.

■ The law firm representing Caremark mistakenly marked the Herring memo and the chronology as trial exhibits and produced them to Norton before trial, even though they had previously been accorded work product protection by a magistrate judge. The district court determined that the documents were not protected work product after all, and that, even if work product protection had applied, defendants had waived the protection by producing the documents. The court therefore admitted the documents over defendants' objection.

The work product doctrine is found in Federal Rule of Civil Procedure 26(b)(3). The Rule provides that documents "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative" may be obtained in discovery "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case." The Rule requires that "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed.R.Civ.P. 26(b)(3).

Referring to this Rule, we cannot say that, under the circumstances, the district court's admission into evidence of the Herring memo and the chronology was a clear abuse of discretion or, even, was prejudicial to Baxter and Caremark. First, it is hardly clear that the documents should have received work product protection. These documents were prepared after Norton's counsel sent a demand letter to defendants, but before any complaint was filed. Neither the authors nor the addressees of the documents were attorneys for the defendants. Second, the Rule requires that the *court* protect against disclosure of protected documents. Here, the defendants themselves disclosed the documents in the course of trial preparation. It does not seem to us an abuse of discretion for the court to have left the parties where they found themselves.

Finally, we are convinced that the admission of the documents did not affect "the substantial rights" of Baxter and Caremark. The Herring memo and the chronology constituted evidence that the defendants were not "in strict compliance" with the Guidelines. This evidence was cumulative, as both Herring and Brown testified that the progressive discipline procedures outlined in the Guidelines had been bypassed. Moreover, the documents were tangential to the defendants' principal argument that Norton had been terminated because he was a "mismatch" or because of the "severity" of his situation. The defendants' contention that the admission of these documents affected their "substantial rights" is simply not persuasive.

### B.

■ The district court allowed Norton to call Perry Silverman, a certified public accountant, as his expert witness on lost pay damages. In order to formulate his opinion as to Norton's damages, Silverman made certain assumptions, including that Norton would have earned a commission in the last quarter of 1989 and that Norton would have continued in the position of general manager up to the date of the trial. Baxter and Caremark contend that both of these assumptions were in error.

According to Baxter and Caremark, even if Norton would have earned a fourth quarter commission in 1989, it would not have actually been paid until the first quarter of 1990. They assert that in fact, Norton's 1989 compensation already included the commission from the last quarter of 1988. By adding a fourth quarter commission to Norton's 1989 income, Baxter and Caremark insist that Silverman provided Norton *five* quarters of commission in his calculations. This mistake was compounded, according to appellants, as Silverman extrapolated Norton's post–1989 losses on the basis of his falsely-inflated 1989 calculation.

In addition, Baxter and Caremark contend that Norton would not have survived in his position until trial. They assert that if he had not been terminated on November 1,

1989, he would have been discharged soon thereafter based on his poor performance. Baxter and Caremark argue that because of these fundamental errors, Silverman grossly overstated Norton's alleged damages.

■ We are not convinced, however, that the admission of Silverman's testimony was an abuse of discretion. Silverman's calculations and assumptions were the subject of rigorous cross-examination. Even assuming *arguendo* his calculations were flawed, it is not apparent they were so "fundamentally unsupported" that they "offered no assistance to the jury." *Loudermill v. Dow Chemical Co.,* 863 F.2d 566, 570 (8th Cir. 1988) (citation omitted). We are reminded that "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Id.* (citations omitted). Even if Silverman's opinions are open to attack on the grounds identified by Baxter and Caremark, "such issues go to credibility, not to admissibility." *Id.* The district court did not commit reversible error in admitting Silverman's testimony.

## IV.

■ Finally, Baxter and Caremark argue that they are entitled to a remittitur because the jury award of $305,000 was excessive. They insist that Norton is, at most, entitled to compensation for 120–150 days, the period of time it would have taken them to terminate him pursuant to progressive discipline procedures. We do not think this court can make such an assumption. As the Minnesota Supreme Court said in *Pine River,* "[o]n this record it is not shown that, if the progressive disciplinary steps had been followed, with the employee having been warned and given an opportunity to mend his ways, he would not have retained his employment to [the] date of trial." *Pine River,* 333 N.W.2d at 632.

■ Baxter and Caremark also contend that the verdict was excessive because it was more than even Norton's expert, Silverman, testified that Norton was entitled to receive. In evaluating this argument, we note that "[a] district court should grant remittitur only when the verdict is so grossly excessive as to shock the court's conscience." *American Business Interiors, Inc. v. Haworth, Inc.,* 798 F.2d 1135, 1146 (8th Cir. 1986) (citation omitted). On appeal, we "recogniz[e] that the trial court has heard the evidence and knows the community's standards." *Id.* We therefore review a denial of a remittitur for "a manifest abuse of discretion," and will reverse "only when in rare circumstances we are pressed to conclude that the verdict represents a monstrous or shocking injustice." *Id.*

Here, Silverman testified, and the jury was entitled to believe, that the net present value of Norton's back-pay damages was $254,095. He also testified that he had arrived at the figure using conservative calculations as to salary growth and had not taken into account employment benefits such as health insurance, life insurance, and long-term disability insurance. Given this testimony, and making allowance for the district court's discretion, we are unable to say that the jury award "represents a monstrous or shocking injustice" or that the district court abused its discretion in denying appellants' motion for remittitur.

## V.

The district court did not err in denying the appellants' motion for judgment as a matter of law or abuse its discretion in denying a new trial or a remittitur. We therefore *affirm.*

*Costs to appellee.*